KESSLER & CO. et al. v. ENSLEY CO. et al.

(Circuit Court, N. D. Alabama, S. D.   September 16, 1905.)

No. 133.

1. ESTOPPEL—CORPORATIONS—RATIFICATION OF PRIOR ACTION—ACCEPTANCE OF BENEFITS.

Where, under authority given by a resolution of its stockholders, the property of a corporation was conveyed to trustees with power to sell and to apply the proceeds to the payment of the company's debts, and the company, with full knowledge of all the facts, allowed the trustees to proceed under the trust to sell property until its debts were paid, and accepted a reconveyance of the remainder of the property and retained the same, such action was a ratification of the conveyances, and steps by which the trusteeship was created and any irregularities or defects in the original proceedings are immaterial, nor can the company or one suing in its right deny the title or authority of the trustees or the validity of their acts, except for fraud or breach of trust.

2. CORPORATIONS—PURCHASE OF PROPERTY BY OFFICERS—CURING DEFECTIVE TITLE.

Lands of a corporation were sold on execution and purchased by the judgment creditor, who conveyed to a second corporation organized for the purpose, in which one of the directors of the first was a stockholder. An agreement was made between the first company and its creditors to convey its property to trustees, who were to sell sufficient to pay its debts and reconvey the remainder, and pursuant to such agreement it conveyed its statutory right of redemption to the lands sold to the trustees, and the second company also conveyed to them its rights therein, thus vesting them with full title. Held, that any equity in favor of the first company which existed in the property while held by the second company, by reason of the fiduciary relation between its organizer and the first company, was extinguished by the conveyance of the property to the trustees, to be held and disposed of for the benefit of the first company, and that certain of the property which was thereafter purchased from the trustees by the second company and such stockholder therein was not affected by such equity.

3. SAME—VALIDITY OF PURCHASE BY FORMER OFFICER—EVIDENCE CONSIDERED.

Evidence considered relating to a purchase of lands of a company by a former director, and by a corporation of which he was a large stockholder, from trustees to whom they had been conveyed under an agreement between the company and its creditors, made by direction of its stockholders, to be sold primarily for payment of its debts, and the transaction held not affected by fraud or concealment of facts on the part of the purchaser, or collusion with the officers of the company or the trustees, nor impeachable on the ground of inadequacy of consideration; the proposition to purchase, before being made to the trustees, having been openly made to the company at a meeting of stockholders, and by them recommended for acceptance to the trustees.

4. SAME—PURCHASE BY DIRECTOR FROM TRUSTEES—BURDEN OF PROOF AS TO VALIDITY.

A purchase of property of a corporation by a director or former director from trustees whose selection he did not control, but who were chosen by the stockholders and creditors to hold the property in trust to sell and pay the company's debts, is not within the strict rule which is applied in case of a purchase by a director from his fellow directors, and the burden of proving that improper influence moved the trustees in making the contract rests upon him who assails it.

5. SAME—SUIT BY STOCKHOLDER—LACHES.

Where a land company, owning a large tract of land of speculative value and largely indebted, conveyed its land to trustees, to be sold so far

as necessary to pay its debts, and certain of such lands were purchased from the trustees by a former director and a corporation in which he was interested, who took possession, made improvements, brought in manufacturing industries, sold lots, and built up a town, stockholders of the company who had knowledge of such facts and to whom knowledge of all other facts relating to the transaction was accessible are barred by laches from maintaining a suit in equity to set aside the purchase by a delay of four years before taking any action to that end, during which time the property had greatly increased in value, largely through the efforts and expenditures of the purchasers.

In Equity. On final hearing.

This was a bill, filed April 25, 1902, by Alfred Kessler and others, minority stockholders of the Ensley Land Company, against the Ensley Company and others, in right of the Land Company, which refused to sue, to set aside the conveyance of a choice body of its lands, which the bill alleges were purchased by four of the defendants, in fraud of the Land Company. The case was before the court on demurrer to the original and amended bills. 123 Fed. 546; 129 Fed. 398. The Ensley Land Company is here referred to as the Land Company, to distinguish it from the Ensley Company; and for brevity the Tennessee Coal, Iron & Railroad Company is referred to as the Tennessee Company. Only a summary of the allegations of the bill, which is quite lengthy, is necessary to a proper understanding of the case.

At the time of, and just before the culmination of, the grievances complained of, the defendant Shook was president of the Land Company and vice president of the Tennessee Company; Baxter was a director of the Land Company and president of the Tennessee Company; Bowron was a director of the Land Company and vice president of the Tennessee Company, McCormack was a director of the Land Company and general manager of the Tennessee Company, Ramsey was assistant general manager of the Tennessee Company, and Barker was president of a bank which held a number of claims against the Land Company, and afterwards became co-trustee with Bowron under a deed of trust to secure creditors of the Land Company. The theory of the bill was: That the defendants, with the exception of Barker, while officers of the Tennessee Company, which owned a majority of the stock of the Land Company, by means of their control of the majority stock, elected what persons they pleased as officers and directors of the Land Company and thus controlled its affairs, and so mismanaged the corporation as to involve it in debt. That they formed a conspiracy, in the latter part of the year 1896, or early in the year 1897, to acquire the property for themselves, and in order to more effectually carry out this conspiracy, and to deceive the Tennessee Company and other stockholders, not in the conspiracy, and to give their purchases a semblance of legality, they formulated the plan of the trusteeship, under which Barker and Bowron became trustees, and were clothed with the title of the company to sell its lands in payment of its debts. That as officers of the Tennessee Company they knew the fact, of which the other stockholders were ignorant, that the Tennessee Company had determined to build a steel plant at Ensley, knowledge of which, if made known to the public, would have greatly increased the value of the lands at that time, and have enabled the officers of the company, by putting the property on sale in the usual way, to have raised enough money to pay its debts, and thus avoided the trusteeship altogether, but that they concealed this knowledge from the stockholders. That in pursuance of the conspiracy Shook secretly induced Mrs. Warner, the owner of a judgment against the Land Company, to sell all the property of the company under execution in January, 1897. That she did so and went into possession. That in December, 1897, the defendants, who concealed their connection with the Ensley Company, caused that company to be formed, and to purchase the lands from Mrs. Warner, and then caused the Ensley Company to convey them to Barker and Bowron as individuals, with the secret understanding that, as soon as the title of the Land Company could be gotten into the trustees, they would make the sales complained of to the Ensley Company and to McCormack. That in pursuance of this conspiracy a meeting of the stockholders of the Land Company was called for the 10th of January, 1898,

which for want of a quorum adjourned over until the 25th of that month, when Shook made the following report to the stockholders: "To the Stockholders of the Ensley Land Company: Since your last annual ·meeting all the property of the Ensley Land Company has been sold by its creditors. On the 25th of January, 1897, the realty was sold by the sheriff, and bought in by the executrix of the estate of James C. Warner, deceased, who was the owner of what is known as the 'Birmingham Railway & Electric Company judgment,' for $15,168.91. About the 18th of September last the personal property was sold for $525, under an execution obtained by Napoleon Hill, of Memphis, Tenn., for $13,348.96. The result of these sales left the Ensley Land Company nothing but the statutory right of redemption. The aggregate amount of indebtedness due is about $130,000. For the purpose of liquidating these debts, the creditors have agreed upon a plan of having the property conveyed to two trustees, Messrs. N. E. Barker and James Bowron, with the understanding, when a sufficient amount of property has been sold to pay off .the debts of the Ensley Land Company and the expenses incident to the execution of the trust, that all the remaining property shall be conveyed to the Ensley Land Company. For the purpose of enabling the trustees to make absolute title to the property they may sell, it is necessary that the Ensley Land Company shall waive its statutory right of redemption. I suggest that our attorneys be requested to draw up such papers as will make effective the will of the stockholders in this respect, and that the directors be authorized to consummate an agreement with the trustees appointed by the creditors."

This report was spread upon the minutes. At that meeting, by a vote of 2,597 shares in the affirmative to 30 in the negative, a resolution, moved by the defendant McCormack and seconded by the defendant Shook, was adopted, which, after reciting the sale under the Warner judgment, etc., that the company owed other debts, and that its property was more than sufficient to pay its debts offered for sale in the ordinary manner, provided, in substance, that upon the execution by Barker and Bowron of a declaration of trust the terms of which should be satisfactory to the board of directors, and providing for the payment of claims of creditors according to their priority, that the president on behalf of the Land Company release and convey the statutory right of redemption. On the 21st day of February, 1898, Shook, in pursuance of the resolution, made a conveyance to Barker and Bowron in the name of the company, they having made a declaration of trust, which is recited in the company's conveyance, by which not only the statutory right of redemption is released to the trustees, but all the right, title, and interest of the company was conveyed to them. At that meeting the following proposition from the Ensley Company was put upon the minutes:

"We will give you $14,600 for 220 acres of land described as follows: 40 acres in townsite, 40 acres near K. C. road, 60 acres beyond Eubanks, 40 acres near No. 3 slope, 40 acres near shaft No. 1. (2) We will guaranty the building of 20 houses on this land in 6 months, 40 houses in 12 months, and 50 houses in two years. (3) You to name a price on each lot and block you are willing to put upon the market, and give us the exclusive right to sell the same, paying 10 per cent. commissions on all such sales. When lots are sold ·on time or in connection with our building operations, we to pay the fixed price ourselves, less the 10 per cent. (4) We will guarantee the sale of ——— of your lots the first year and ——— in two years the building of houses thereon ——— months. (5) We will cause to be erected, in one year from this date, at Ensley, a foundry and machine shop of capacity to do all work obtainable and to enlarge same as business demands. (6) We will cause to be put in operation a red brick making plant with capacity to furnish brick for all local demands. (7) We will cause to be erected and operated a planing mill with cutoff saws sufficient for the needs of the town. (8) We will locate a drug store at Ensley. (9) We will locate a lumber yard and builders' supply store. (10) Proper material being found at Ensley and furnished us at competitive prices, we will cause to be erected a plant for the manufacture of bolts and nuts. (11)·Also a plant for the manufacture of rivets. (12) Also a plant for the manufacture of steel plow shapes. (13) Also a plant for the manufacture of boilers and bridges. (14) Suitable material being found at Ensley, we will erect a plant for the manufacture of lime. (15) If found

practicable, and molten steel is sold us at reasonable prices, we will cause to be built a plant for the manufacture of steel castings. (16) For the location of industries, free sites to be donated by you. (17) It is understood that in the location of manufacturing industries we are to have the support and approval of the trustees and of the Tennessee Company, who would be expected to give industries at Ensley as low net prices on raw material as given any one located elsewhere." Whereupon the following action was taken by the stockholders: "Resolved, that it be recommended to the trustees that they trade with the Ensley Company on the lines indicated in the proposal which is submitted by the Ensley Company at this meeting." That after the president of the Land Company executed the conveyance to Barker and Bowron they made the sales complained of to the Ensley Company and to McCormack; the other defendants, with the exception of Barker, having a secret interest therein. The bill further alleged that the property was sold for about one-tenth of its value. That the sales were by acreage, and not by blocks and squares as laid out in the plan of the city, and were, in fact, secret sales. That the trustees allowed the purchasing defendants to select the choicest portions of the property adjacent to the reservation by the Tennessee Company for the steel plant, which was built at that point a few months after the sales. That the Tennessee Company was indebted to the Land Company in the sum of $40,000 or $50,000, which defendants failed to collect, which could have been utilized by them to relieve the Land Company from the pressure of creditors, most of whom were willing to wait for the payment of their claims. The opinion states other facts which are set forth in the bill as badges of fraud, and certain objections which it makes to the validity of the proceedings at the stockholders' meeting and the legal and equitable effect of the several conveyances. The excuse given for not earlier filing the bill was held sufficient in Kessler & Co. et al. v. Ensley Co. et al., 129 Fed. 398, and need not be here repeated. The bill prayed a decree vacating the sales to the respondents, and requiring them to reconvey the portions of the land which had not been sold, and account for those which they have sold to bona fide purchasers, and for a decree against the defendants individually for their several breaches of trust, and also "for a decree requiring them to account for the rents, issues, profits, and proceeds received by them as the result of or by reason of any of their dealings aforesaid." The court dismissed the bill on the merits, and also for laches.

J. W. Baker, T. M. Steger, Smith & Smith, and I. K. Boyesen, for complainants.

Knox, Acker & Blackmon, James C. Bradford, John F. Martin, and E. J. Smyer, for defendant.

JONES, District Judge (after stating the facts). The bill is lengthy, and the agreed facts and the testimony are voluminous. The evidence follows the range of the acts and motives of a number of individuals over a period of several years, in which the history and conduct of large corporate concerns are unfolded in support or denial of bitter charges of fraud against corporate managers. Such complaints must be heard by courts with painstaking care, and the discharge of the duty in this case compels extended examination of the evidence. It is not practicable, without swelling this opinion to an intolerable length, to detail or dissect the many minute facts and circumstances which have had the attention of counsel in their earnest and able arguments, or to do more, in dealing with this mass of evidence, than to discuss the prominent facts and controlling features of the case. Some legal questions, decisive of many of the contentions, must first be disposed of.

1. It was held on demurrer to the amended bill that the Land Company, as the case was then presented, had ratified the conveyances and

steps by which the trusteeship was created, and the title and powers lodged in the trustees, and was legally bound by all the lawful acts of Barker and Bowron in the execution of their trust. Kessler et al. v. Ensley Co. et al. (C. C.) 129 Fed. 397. The proof shows, with knowledge that the title to its property which had passed to Mrs. Warner had been conveyed by her to the Ensley Company, which, in turn, had conveyed to Barker and Bowron, and being fully advised of the resolution of the stockholders' meeting held. January 25, 1898, looking to the creation of the trusteeship, and that the conveyance then authorized to the trustees had been made and delivered, the Land Company allowed the trustees to continue in possession of the property and title thus acquired, and to go forward in the execution of the trust for over a year, applying the proceeds of sales of the property while in their hands to the payment of the Land Company's debts, and that the company received and kept the declaration of trust, settled with the trustees, taking from them, and collecting as its own, notes and securities for lots sold, and finally holds all the unsold lands under a reconveyance from these trustees. It cannot accept and retain the benefits of the trusteeship and at the same time repudiate the powers and title under which it held and lawful acts done thereunder. It cannot now deny that they were its trustees, and had its title to the lands and its authority to sell them, nor can it undo or assail their acts, except for fraud, breaches of trust, and the like, as is open to others to undo or avoid the acts of their trustees. Having acted with full knowledge, it it is bound by its election and ratification and the legal and equitable rights thereby created against it. Neither it nor any one standing in its shoes can now recall its act, or the consquences which flow from it. Pneumatic Co. v. Berry, 113 U. S. 327, 5 Sup. Ct. 525, 28 L. Ed. 1003; Taylor v. A. M. Ass'n, 68 Ala. 229.

It is, therefore, no longer of legal consequence that the corporate meeting, at which the creation of the trusteeship and the conveyance by the Land Company to the trustees were authorized, was held at Birmingham, instead of at Ensley, as required by the by-laws; or that there were infirmities in the sheriff's sale; or that the proxy upon which the majority of the stock was voted at that meeting was irregular or unauthorized; or, as urged, that the directors alone, not the stockholders, had authority to order the conveyance or the relinquishment of the statutory right of redemption to the trustees; or that these things could not be legally authorized, except after advertisement for 30 days; or that the board of directors did not pass any resolution or take any formal action expressing satisfaction with the terms of the declaration of trust; or that the resolution did not authorize the conveyance of all of the company's right, title, and interest. The corporation, acting through the proper instrumentalities and in the proper mode, could legally have done all the things complained of. These objections involve matters wholly intra vires, and private, as distinguished from public, wrongs. Such acts may be cured by corporate acquiescence or ratification; and here we have both on the part of the Land Company.

2. It is urged by complainants that "Barker and Bowron were

themselves trustees ex maleficio after they purchased from the Ensley Company, and they could not convey the lands freed from the trust, except to a purchaser without notice," and that the Ensley Company and McCormack and Ramsey were not such purchasers, and, "if the proceedings of the stockholders and deed made by Shook on February 21, 1898, be held sufficient to confer title on Barker and Bowron, trustees, they were inoperative, because the legal title was already in Barker and Bowron, and when they acquired it the statutory right of redemption merged, leaving the equitable estate in the Ensley Land Company, and a conveyance to the trustees never passes the equitable estate to them." As we understand this contention, it is that the lands had never been freed, as to the purchasing defendants, from the trust resulting from the dealings with Mrs. Warner, and that McCormack and Ramsey and the Ensley Company now hold the portion of the lands repurchased by them from the trustees, after the trustees bought from the Ensley Company, subject to the resulting trust which the law impressed upon it, by reason of McCormack's fiduciary relations, while the Ensley Company held the title under purchase from Mrs. Warner.

Bowron and Barker doubtless were trustees ex maleficio as regards the Land Company, so long as their title rested only on the deed from the Ensley Company, but that infirmity of their trust was cured, and thereafter they became perfect trustees, rightfully clothed with the whole title. They acted in behalf of the Land Company and its creditors jointly, with the sanction and commission of both, to effect a purpose highly beneficial to both. They were seised first in right of judgment creditors whose liens were superior to the right or title of the Land Company, if the title had remained in it. Next, they held the legal title of the Land Company by purchase from the Ensley Company. That company acquired title from Mrs. Warner, whose conveyance, under her execution, extinguished the title of the Land Company. When Mrs. Warner put her title in the Ensley Company, that company, owing to McCormack's interest in it and his fiduciary relations at that time to the Land Company, acquired only the legal title, and the equitable estate or title remained in the Land Company. When, however, the Ensley Company conveyed the title to Barker and Bowron, in furtherance of a direct trust to them, for the Land Company and its creditors and that plan was consummated by the Land Company's conveyance to the trustees, whatever trust or equity had resulted or been impressed upon the lands, as between the Ensley Company and the Land Company, by reason of McCormack's fiduciary relation while the title was in the Ensley Company, was extinguished and disappeared. McCormack, the fiduciary, acquitted himself of the duty which the law imposed upon him, and the title was cleansed of any estate created in the lands or against him by his purchase of the Land Company's property from third persons. Equity regards as well done, however irregular or defective the mode by which it is accomplished, that which ought to have been done. The Ensley Company's conveyance to the trustees put the title to the estate where the law and equity alike demanded it should be lodged. The equitable estate which the Ensley Company's

purchase created in favor of the Land Company, while the Ensley Company held the property, was founded only upon the status of a purchase by a fiduciary, and when that status was destroyed by the conveyance to Barker and Bowron and the conveyance by the Land Company to them, that particular equitable estate which was founded only on that status perished with it.

The legal and equitable quality of the estate which Barker and Bowron held, after the conveyance to them from the Ensley Company, was, so far as concerns the Land Company's statutory right of redemption, precisely what it would have been, had Bowron and Barker purchased directly from Mrs. Warner, and held in no other right, for the trustees could not be vested, by the conveyance from the Ensley Company, with any greater or different degree of title than had been divested out of the Land Company, by the sale and conveyance to Mrs. Warner. Neither the conveyance by the Ensley Company to Barker and Bowron nor their declaration of trust would have extinguished the statutory right of redemption, if the trustees had not acquired it from the Land Company. Until the Land Company conveyed or relinquished its statutory right to the trustees, it is clear it could have exercised that right at any time within the statutory period, and its exercise would have terminated all the estate and title Barker and Bowron acquired by the purchase under the conveyance from the Ensley Company alone.

The relinquishment of the statutory right by the Land Company to the trustees will be treated in equity as a transfer of the right to its creditors; the trustees being regarded only as the conduit to pass that right to the creditors. It did not merge in the legal title, although, after the conveyance by the Land Company to the trustees, the prior legal and equitable estate of the Land Company were both put in the trustees. In equity, different rights and titles held by a trustee as a security for debt will not be held to have merged, when it does not promote the accomplishment of the trust or detracts from the value of the security. The trustees were armed with the statutory right of the Land Company for the benefit primarily of creditors, and, next, for itself. The only equity or estate which remained in the Land Company, after its consent and that of creditors to the trust and its conveyance to the trustees, was the equitable right to redeem the property from the trust upon the payment of the debts, or to compel its faithful application to that purpose. With this single exception, the whole estate, legal and equitable, had been lodged by the several conveyances, directly in Barker and Bowron, as trustees, and the title, during the time they administered the trust, was not charged or affected by the extinguished equitable estate of the Land Company in the property against the fiduciary, which existed under his purchase only while the Ensley Company held it, and which perished not only because the status upon which that equity alone was built, had been destroyed, but because it was inconsistent with the estate which the Land Company itself conveyed to the trustees and the rights the creditors took thereunder.

Consequently the conveyance by Barker and Bowron, trustees, to the Ensley Company and McCormack and Ramsey of a portion of the

property which the trustees bought from the Ensley Company, could not be ineffective, for want of estate or power in the trustees as against the Land Company, to convey a good legal and equitable title to the Ensley Company, McCormack, and Ramsey, nor would it carry back or regraft upon the title thus conveyed to them by the trustees the trust or equity impressed upon the property while it remained in the hands of the Ensley Company, under its first purchase, because of Mc-Cormack's fiduciary relations to that purchase. If any trust is now impressed in favor of the Land Company upon the title to the portion of the lands resold by the trustees to the Ensley Company, McCormack, and Ramsey, it cannot be because McCormack was interested in the Ensley Company at the time it surrendered its title to the trustees, but it must arise either because of actual fraud in the subsequent repurchase from the trustees, treating it as an independent transaction, or because the original acquisition of title by the Ensley Company and its conveyance to the trustees and their reconveyance of a portion of the land to the Ensley Company, McCormack, and Ramsey, were parts of one and the same fraud, or because, independent of these things, the purchase from the trustees was effected while McCormack occupied such relations to the Land Company, and under such circumstances, though he had ceased to be a director, that a court of equity ought not to permit the sale to stand.

3. The general rules for judging the conduct of persons charged with fraud are stated in Conard v. Nicoll, 4 Pet. 295, 7 L. Ed. 862, where the Supreme Court of the United States laid down three rules which should govern in weighing the evidence, which that court in the subsequent case of United States v. Arredondo, 6 Pet. 691, 8 L. Ed. 547, declared incontrovertible:

"(1) That actual fraud is not to be presumed, but should be proven by the party who alleges it; (2) if the motive and design of an act may be traced to an honest and legitimate source equally as to a corrupt one, the former ought to be preferred; (3) if a person against whom fraud is alleged should be proved to have been guilty of any number of instances, still, if the particular act sought to be avoided be not shown to be attended with fraud, it cannot be affected by these other frauds, unless in some way or other it be connected with or form part of them."

4. As the warp and woof of complainants' charge of fraud centers around defendants' conduct while they were officers of the Land Company and at the same time officers of the Tennessee Company, and the motives which complainants ascribe to that conduct, it is necessary to go minutely into the history of the Land Company and its affairs, and also to inquire somewhat fully into the condition and policy of the Tennessee Company during that period, and into the events which led to the formation of the Ensley Company, and its connection with the transaction. It will facilitate an understanding of these matters to state here that some time before, and at the culmination of, the transactions complained of Shook was president of the Land Company and vice president of the Tennessee Company; Baxter was a director of the Land Company and president of the Tennessee Company; Bowron was a director of the Land Company and vice president of the Tennessee Company; McCormack was a director of the Land Company

and general manager of the Tennessee Company; Ramsey was assistant general manager of the Tennessee Company, and had no connection with the Land Company; and Barker was an outsider, representing creditors, having no connection with either company, save as trustee for the Land Company and its creditors to sell its property to pay its debts. As all the charges of fraud and collusion are denied, and also of interest, save on the part of McCormack and Ramsey, in the purchases, we will consider separately the various acts relied on as badges of fraud, and the just inferences to be drawn from each of them singly, and then take them as component parts of one continuous administration of the property, in view of all the facts and circumstances, in order the better to judge what countenance and form should be given the final outcome.

### The Land Company.

5. The Ensley Land Company was incorporated on the 14th of January, 1887. Two weeks thereafter the Tennessee Company conveyed to it 3,797 acres of land, reserving the mining and mineral rights in the land, receiving in return $10,000,000 of the stock, at which the whole property was capitalized. The Land Company was the conception of Enoch Ensley, the owner of the Pratt mines and the Alice furnaces, which he merged in the Tennessee Company, retaining a considerable portion of the stock. After the sale Ensley took a companion to a place in the present corporate limits of the town of Ensley, and pointed out the lands, saying:

"This is the center of a great manufacturing city which is to bear my name. I intend to build four big blast furnaces and a steel plant on the line of the Pratt railroad, and then it is my purpose to bring other manufacturing plants here that will work up all the product of the furnaces and steel plant, including wire rod mills, hoop mills, and car works. I intend to fill this valley, from the foot of the chert ridge to the railroad, with manufacturing plants and business houses, and I intend to use the whole of this chert ridge for residences, and the day the work commences I will agree to pay $200 a foot for this corner lot; and here I will build the Bank of Ensley."

It was natural, with these expectations, that the company should be organized upon inflated values and operated upon expensive plans. The company from the beginning encouraged manufacturing and other enterprises. It authorized its directors to donate easements and rights of way and sites for manufacturing plants, and to expend 75 per cent. of the proceeds of the sales of lots in aid of manufacturing and other enterprises, and in the improvement of the property. Waring, an eminent sanitary engineer, was employed to make plans for a town. Some sanitary ditches were cut. Streets were surveyed and the trees cut out of them, and work done upon some of them. A two-story wooden hotel and two or three cottages were erected near the spot which was expected to be the center of the future town. A dummy line, giving rapid communication with Birmingham, ended near the hotel. Mines of the Tennessee Company were opened conveniently near by, and it built the blast furnaces. The lands, after advertisement, were put upon the market, and then withdrawn from sale in expectation of higher prices, and subsequently put upon the market, but without success. The tide of prosperity was then ebbing and did not soon return.

The enterprise stagnated. Bushes grew up in the streets and ditches, and the center of the town remained as before, a barren field, and the only roads were the ordinary country roads. The total gross sales of lands from the organization of the company to the appointment of Barker and Bowron as trustees, were $2,350. The company had contracted debts, and borrowed money, from time to time, upon a scale commensurate with the expectation of its founders. As lots were not sold, the amount of the debts continued to climb up, and, not being paid, were put in suit and judgment. In the five years just prior to the stockholders' meeting at which the trusteeship was formally created, judgments had been rendered each year against the company, amounting in all during that period to $50,617, and duly recorded, creating liens in the order of their record, and there were also outstanding what were called judgment notes and other debts. Ensley was the first president of the Land Company, and held office until 1891, when he was succeeded by T. T. Hillman. Both of them were men of fine intelligence and high character, who had achieved success and distinction in the business world. In the last year of Hillman's presidency he notified the stockholders that the sale of all the company's property was threatened under execution on the Warner judgment. That sale took place in January, 1897. In September of that year Napoleon Hill, another judgment creditor, sold under execution all the personal property of the company, including its office furniture. Mrs. Warner took possession under her purchase. The company did not then have even a corporate home, and its office naturally was moved to Birmingham, the office of the Tennessee Company, its chief stockholder. The municipality of Ensley was first incorporated January 24, 1899, nearly 12 years after the Land Company was organized, some 80 voters participating in the election for incorporation, and a few more than a score of persons resided on the lands, when the trustees took possession of them.

When defendant Shook succeeded Hillman as president of the Land Company, in November, 1897, that company had nothing whatever in its possession or under its control, but its statutory right of redemption. Creditors continued to press the collection of their debts. Hill, on account of the gross overvaluations of the land, in which the subscriptions to its capital stock were paid, claimed that the Tennessee Company was liable to creditors of the Land Company, as upon an unpaid stock subscription, and brought suit against it accordingly. He was also threatening to redeem from Mrs. Warner. The attorney of the Tennessee Company had given the opinion that there was great doubt of the company's right to redeem from a judgment creditor, if one redeemed from Mrs. Warner. If there had been a market for the property, the condition of the title prevented making sales in the usual way. Even with creditors assenting to the trust, no one would buy from the trustees with the right of redemption remaining in the Land Company. Investors would naturally decline to purchase, when the profits from increase in values could be taken from them by redemption of the lands, at the option of the company. In January, 1898. the debts of the Land Company amounted to about $130,000.

Its capital stock had been reduced from $10,000,000 to $500,000 in April, 1893. The evidence shows most clearly that the defendants were in no wise responsible for the straits to which the company now found itself reduced.

Beginning in January, 1897, the directors of the Land Company, its attorney, and the attorney of the Tennessee Company, and Shook, Baxter, and Bowron began actively to plan to extricate the company from its difficulties. Baxter, Bowron, and Shook, and the attorney of the Tennessee Company, each, had conferences or correspondence with different creditors, and with officers of the respective companies. A circular was issued and sent to creditors dealing with the indebtedness and condition of the company, suggesting the basis of the plan which, with no practical changes, though the mode of execution was somewhat different, was afterwards carried oût. The negotiations with the judgment creditors were conducted only to a limited extent by Bowron, and apparently left mainly to Walker Percy, the attorney of the Tennessee Company. He visited New York, conferred with the officers of the Tennessee Company and with representatives of some of the creditors there, and induced the clients of F. G. Dow to assent to the plan. Early in the year Baxter had written to Barker, the president of a prominent Birmingham bank, the largest judgment creditor, to get his co-operation, which was given. Baxter suggested the bank might act as trustee in event of a mortgage, or as agent for creditors, if they would pool their claims. Barker replied it would be better to have an officer of the bank and also an officer of the Tennessee Company to act. Some time in October or November, 1897, at a conference between the attorney of the Land Company and the attorney of the Tennessee Company and Shook, it was agreed, in line with Barker's suggestion, that Bowron should be selected on the part of the Tennessee Company and Barker as the officer of the bank. The executive committee of the Tennessee Company was fully advised of the plan, and on December 20, 1897, authorized certain guarantees to induce the clients of F. G. Dow to assent to the arrangement. When Shook wrote the Trust Company for the proxy to be voted at the intended meeting, at which the whole matter was to be submitted to the stockholders, Hillman, a former president of the Land Company, was advised, and also wrote the Trust Company, saying, in substance, that the plan was decidedly for the benefit of the Tennessee Company and also of the Land Company, with whose affairs he was well acquainted. The meeting was called for the 10th of January, 1898, and then adjourned over for the want of a quorum until the 25th of January, 1898, when it was held. Notice of the meeting and a copy of the circular urging attendance were published in the Birmingham Age-Herald, and mailed to every stockholder of record in the Land Company. It evidently reached those of the stockholders whose correct addresses were know to the secretary. The Trust Company received both notices, as also Hill, who resided in Memphis, Tenn., the latter sending them to his attorney, White, at Birmingham, directing him to attend the ensuing meeting in his interest. The fullest publicity was given to the plan, and the purpose of the call of the meeting which was to pass on

it. Nothing about the plan was hatched in secret, nor was anything clandestine done or attempted to be done to procure its adoption. Every official or body, having the right to speak or act in behalf of either company, was informed and approved the plan.

6. Much testimony has been taken as to the ability, and argument made as to the duty, of the defendants to have procured the necessary money for the creditors from the Tennessee Company, and thus avoid the trusteeship altogether, or at least put the trustees in such a position that they would not be forced to make speedy sales. The real question, however, is not whether the best plan was attempted, but whether the plan actually determined on was honestly conceived and pursued, and formed with reasonable care and skill. The Tennessee Company evidently preferred the plan of a trusteeship under which creditors would wait until sales could be made to pay their debts, and was co-operating with the officers of the Land Company for its consummation. Aside from the Tennessee Company's not being under duty to furnish the money, the testimony as to its condition at that time, in connection with the well-known history of the times, shows that the Tennessee Company itself was then hard pressed, and that it is extremely improbable that it would have aided, at that time, to the extent complainants insist it would have done. The following extract from a letter from the treasurer of that company to the chairman of its finance committee, under date of September 22, 1897, is very pertinent. In this letter the treasurer, after expressing surprise that nothing had been done to meet October interest, says:

"The company is now making money for the first time in half a year, after having been on the brink and at the very verge of collapse. It will require several months nursing and care, even with the profitable business in sight, before it can regain a condition of what I consider normal ease, and it will require a year of as good business as we can hope for to put it in what anybody else would consider decent and reasonable financial shape."

Later, in the same year, the Tennessee Company was pledging its pig iron account to secure money, and there is evidence that it was called on to meet heavy demands outside of its current expenses. Evidence was introduced that a few months later the Tennessee Company was borrowing money at easy rates. But, whatever may have been its financial condition at this time, the company was under no legal obligation to shoulder the burden of the rescue of the Land Company, and there is nothing in the evidence which shows that it purposed to do so, or that the defendants kept it from doing more than it did, or withheld from the controllers of its finances and destinies any information bearing on the subject.

7. It is urged, however, that the resolution of the executive committee of the Tennessee Company October 7, 1897, directing its officers "to co-operate with the reorganization committee of the Ensley Land Company, in the plan looking to the adjustment and settlement of the affairs of that company with existing creditors," and authorizing them "to take such steps and incur such liability as in their judgment they may deem proper," shows both willingness and ability, which were at the disposal of defendants, to prevent the creation of the trusteeship, or, at least, the making of the arrangement that was made, whereby the

right of redemption was released to the trustees. It is to be observed that this resolution is not a general letter of credit to the officers. They were to exercise the authority of incurring such liability as in their judgment might be proper, only in co-operating with the reorganization plan. All concerned construed the resolution as not intended to involve the Tennessee Company where it could be avoided, and the executive committee was consulted, and its authority asked to the steps taken to that end. Significant evidence of the disposition of the Tennessee Company, at that time, not to go further than it was absolutely compelled to do to make the plan a success, is found in a letter from Bowron to Woodward, chairman, dated November 1, 1897. The finance committee, it seems, had declined to authorize a guarantee to the clients repre. ented by Dow to induce them to come into the plan, on the idea that there was nothing in the claim against the Tennessee Company by creditors of the Land Company on account of the inflated stock. Bowron sends a statement of the Alabama law on the subject from the Company's counsel, saying, with Dow's clients out of the way, the attorneys thought there would be no further danger of suits on that account against the Tennessee Company, except those pending, which they thought would be defeated on the ground of estoppel. Hill, it seems, was one of the original stockholders. It was only after the danger of action by Dow's clients was pressed that the executive authorized the guarantee which finally brought Dow's clients into the agreement, and that authority was withheld until as late as December 20, 1897. The object of the resolution was not to obviate the necessity of carrying out the plan as determined on, by buying up claims of creditors or paying them in cash, but to use the credit of the Tennessee Company, only so far as might be necessary to induce the creditors to assign their claims to the trustees and wait for sales of the lands to satisfy debts. Hence it was later on, after negotiating with Hill, as late as February, 1898, that the Tennessee Company guarantied the payment of his claim within a certain time, and paid a part, to induce him to assent.

8. It is urged that, at the time of the formation of the trusteeship and sales complained of, the Tennesse Company owed the Land Company between $40,000 and $50,000, which the Land Company directory should have utilized to relieve the Land Company. This indebtedness is said to be made up of a liability of the Tennessee Company for timber cut off the premises of the Land Company, the collection of rents for houses which belonged to the Land Company, and the sum of $1,600, received under a conveyance by it to the Ensley Railway Company for rights of way. The evidence as to all these matters is quite meager and indefinite. The claim for the timber arose, according to the witness who seems to have most knowledge of it, because contractors of the Tennessee Company, when it was erecting some improvements at Ensley, cut timber with its consent or direction. The amount or value of the timber is not stated, neither is the date when it was cut. The collections for house rent are alleged to have commenced in 1887, and come down to 1903. The meager proof shows that these houses were built by the Tennessee Company be-

fore the Land Company was incorporated, and that they were very near the Tennessee Company's mines. It is insisted that the mining rights which the Tennessee Company reserved authorized it to use the surface of the soil to support houses near the mines for operatives. It does not appear how long the Tennessee Company exercised control over these houses after the conveyance to the Land Company, or whether the holding was adverse, or for a sufficient length of time to ripen into a title. It is not at all clear that the sum of $1,600, said to have been received by the Tennessee Company for the conveyance to the Ensley Railway Company of date July 5, 1887, was not made in furtherance of, and really as a part of, another conveyance of later date, August 17, 1887, by the Land Company, to the Ensley Railway Company as a part of the consideration given it to induce it to build into Ensley. There is nothing upon the books of either company in regard to these claims. They were not presented to the Tennessee Company, either by the predecessors or the successors of the defendants in the management of the Land Company's affairs. The Tennessee Company has never passed on these claims or acknowledged them. The clerks and officers who testified as to the memorandum reports concerning these matters have no personal knowledge of their correctness. Moreover, it appears that the declaration of trust was prepared by the respective attorneys of the Land Company and the Tennessee Company, who, we must infer, knew whether the one was debtor to the other, and the Tennessee Company was mentioned as a creditor of the Land Company, the payment of whose claims was subordinated to those of judgment and other creditors. When the trustees reconveyed to the Land Company, which was only after all the creditors were settled with, the money being raised by notes of the Land Company indorsed by the Tennessee Company, the latter was recognized as a creditor and note given accordingly. Shook is the only one of the defendants who says he heard of the matter before this suit. He had "heard talk that the Tennessee Company was indebted to the Land Company for rent and timber, but what he heard was not definite, nor had any accounts been formulated." Personally, he knew nothing about it, except as to the cutting of some timber for mining purposes. He stated, as to the houses for which rent is claimed, that there were some houses, "a laboratory, and some little tenement houses, built on what was thought to be the reservation," but it turned out that the houses were on lands conveyed to the Land Company. It is also shown that in 1894 an opinion had been given by the attorney of the Tennessee Company adverse to the right to cut timber to light the furnaces, but to the effect that it might cut timber for mining and transporting coal to market. Defendants insist that bringing these matters forward at this time is due to the exigencies of the litigation. Certainly, in this state of the proof, no court can find that the Tennessee Company was indebted to the Land Company in the sum named or in any other amount, and most assuredly it does not furnish any basis for a judicial finding that the failure to collect these amounts is a circumstance to prove fraud, or shows a breach of trust on the part of the defendants.

## The Steel Plant.

9. As far back as 1891, the Tennessee Company began to consider the advisability of erecting a steel plant. The next year it appointed a committee to investigate the erection of a steel plant at South Pittsburg, Tenn., and later on a committee charged with the same subject was empowered to employ an expert and recommend a location. In 1893 the Tennessee Company leased the Henderson Steel Works, at Birmingham, and a committee, which considered the result of the experiments at steel making there, reported that it "was unnecessary to make any argument as to the advisability of the company's erecting a steel plant, as the reasons were so potent they took it for granted they would be admitted." The same year the governing committee of the Tennessee Company received a report from the steel committee after a visit to various works. In 1895 the president, in his report to the stockholders, urged the erection of a steel plant without delay. In the same year the executive committee appointed a special committee to take up the subject. In 1896 the president, in his report, again referred to the subject, and recommended that full authority be given the directory, and a resolution was passed by it to establish a steel plant, to be operated by the company, or otherwise, with discretion to act as they deemed best. At a meeting of its directory, shortly afterwards the whole matter was referred to a committee with power to act, and next day the directors passed a resolution for the erection of a steel plant near the company's furnaces in the Birmingham district, to cost $800,000, provided the president can secure not less than $300,000 from the railroads and persons locally interested. The testimony shows that the annual reports of the president of the Tennessee Company for the years 1894, 1895, and 1897 were mailed to every stockholder of record of the Tennessee Company. In March, 1896, a prominent article was published in the Birmingham Age-Herald on that subject, alleging that $1,000,000 had been provided by the Tennessee Company and the Sloss-Sheffield Steel & Iron Company, in combination with certain railroads, to erect a steel plant. Various articles in the newspapers had been published by Messrs. Bowron, De Bardeleben, and Hillman, at various times in 1894, 1895, 1896, and 1897. A special pamphlet had been published by the Tennessee Company on February 1, 1897, which was prepared by Ramsey and approved by Bowron, Shook, and Baxter, which contained a reference to Ensley, the interest held in it by the Tennessee Company, and directing attention to its suitable location for steel works, a copy of which pamphlet the testimony shows was mailed to all the stockholders, including complainants. From 1896 to December, 1897, nothing further was done upon the subject. Baxter had urged the matter upon his company, and had conferences with president Smith, of the Louisville & Nashville Railroad Company, who was urging the necessity for a steel plant in the Birmingham district, and insisting, if the Tennessee Company would not undertake its building, he desired its assistance to enlarge the steel plant of the Birmingham Rolling Mills. Stobert, a banker at Pratt City, being asked whether the question of building a steel plant at Ensley had been much discussed in that neighborhood, stated:

"Yes, sir; there had been talk of it for several years. It was a matter of common knowledge in Ensley, Birmingham, and Pratt City, and in that vicinity, that such a question was being agitated and considered by the Tennessee Coal, Iron & Railroad Company. The location of the steel plant at Ensley had been the subject of discussion in the press and among the people in that locality for years."

Up to 1898, for one reason or another, all these efforts came to naught. The upshot of the long discussion and agitation was that on the 20th of December, 1897, the executive committee of the Tennessee Company disposed of the subject by a resolution to the effect, if the "Birmingham Rolling Mills would enlarge its plant to a daily output of 500 tons, and buy basic iron from the Tennessee Company, it would agree to take $100,000 of the proposed issue of bonds at the same rate as taken by the Louisville & Nashville Railroad and other large subscribers, to be paid at the rate of 10 per cent. per month in pig iron at current market rates, and the Tennessee Company would agree not to build directly or indirectly a competitive plant in the Birmingham district for ——— years, provided the work was promptly pushed to completion." Eight days after the adoption of this resolution, which was a decision not to erect a steel plant at Ensley, but to build it elsewhere, the Ensley Company conveyed the lands purchased from Mrs. Warner to Barker and Bowron.

10. It is urged, however, that the defendants had some secret knowledge, which it was their duty to disclose, concerning the steel plant at Ensley. This insistence is founded on the fact that, about a week after the Tennessee Company's determination not to build a steel plant at Ensley, both Baxter and Bowron wrote the executive committee of the Tennessee Company expressing regret at its action, and that Bowron, in his letter, arguing the matter, asked:

"Is it not possible while you and associates are working up there on the railroad that you can agree to turn us loose down here on the steel plant? It is one that we understand, and we feel willing to wrestle with it."

In this same letter he stated his opinion, if the committee would give the officers the permission to go ahead, they would not only put up steel works within a year, but would find the money themselves to accomplish it. On January 3, 1898, Woodward replied to Bowron, stating, among other things:

"The committee is perfectly willing to turn the officers loose, and will treat very hospitably any plan which may hereafter be stipulated which will bring about the desired result, without drawing upon funds which do not exist."

And he added that:

"The resolution in reference to the Birmingham Rolling Mills must be rescinded, if we are to build a steel plant in the Birmingham district."

Baxter, on the 6th of the same month, writes to the executive committee:

"That we will at an early date enter heartily into the subject, and I really have great hopes of success."

Baxter, on the 10th of January, writes that he had an interview with Mr. M. H. Smith, in which the former stated that the Louisville & Nashville Railroad and the Southern Railway would each have to

subscribe $200,000, and the project could not succeed if their subscriptions were less. Smith took the matter up with Belmont, and was favorable to it. On March ———, 1898, Baxter wrote to Belmont asking for $200,000 from the Louisville & Nashville Railroad, and a similar amount from the Southern. No answer was received at that time, as he had to consult with others. On the 4th of March, 1898, Bowron wrote Woodward that he had not written sooner about the steel plant because the permission given by the committee "to get up a plan without calling upon the members for financial assistance, required that they should look elsewhere for money; and that he had not gone far enough in the negotiations to make an intelligent report." On the 17th of March the resolution authorizing the directors to subscribe to the bonds of the Birmingham Rolling Mills was rescinded. On the 21st of March, 1898, the executive committee were authorized to employ an independent expert to report to the committee on the expense of constructing a steel plant and the cost of producing steel at Ensley. In April, 1898, the committee on steel plant was requested to prepare the necessary plans for the organization of an underwriting syndicate to subscribe to $1,100,000. On the 12th of July, 1898, a meeting of the stockholders was directed to be called on the 15th of September, 1898, to determine whether they would give their approval to the disposal of the property to the Alabama Steel & Shipbuilding Company. The first subscription was obtained April 6, 1898. On the 30th of that month the local officers of the Tennessee Company were informed that it would be necessary for at least $150,000 of the necessary amount to be underwritten in Alabama. The underwriting agreement was completed June 30, 1898. Under its terms no subscription was binding until that time, for it was conditioned on all being subscribed. The matter was to be finally determined by the action of the stockholders' meeting September 15, 1898.

From this recital, it is manifest when the stockholders of the Land Company met January 25, 1898, and passed a resolution providing for the trusteeship, and directing the conveyance to Barker and Bowron, and when the trustees accepted the proposal of the Ensley Company and McCormack and Ramsey, the Tennessee Company had not only determined not to build a steel plant at Ensley, but, on the contrary, had determined to aid the Birmingham Rolling Mills, and that resolution was not rescinded until March 17, 1898. It was impossible, therefore, in the nature of things finite, for any of the defendants to have concealed from the stockholders at the meeting of January 25, 1898, knowledge of a determination of the Tennessee Company, which did not then exist.

At the time of the creation of the trusteeship and the sales of the 230 acres to the Ensley Company, McCormack, and Ramsey, the defendants were not possessed of any knowledge which was not open to the public, except, perhaps, the fact that the Tennessee Company had declined to build at Ensley, and decided to build the steel plant at Birmingham, and that defendants were endeavoring to induce it to change its mind, or to get others to build at Ensley, and had strong hopes of success. As late as March, 1898, Bowron had written that

they "had not gone far enough to make an intelligent report." Every intelligent person about Birmingham and Ensley, and certainly every stockholder of the Land Company, knew of Ensley's attractiveness as a location for a steel plant, and that frequent efforts had been made to locate one there, and was aware that every one interested in Ensley had strong hopes that a steel plant would be built there in the near future. This was the sum and substance of all the information of any value the defendants could have imparted to anybody, at the time of the transactions complained of. The outcome of their venture, viewed by the fate of similar undertakings, was very uncertain and problematical. To have announced that the Tennessee Company had declined to build at Ensley and determined to build elsewhere, and that defendants were making efforts, which they hoped would succeed, to induce it to reconsider, which had not then progressed far enough to enable them to form any intelligent judgment as to the result, would only have been the same old story with which the public was entirely familiar.

Being under no duty to the Land Company to procure the building of a steel plant at Ensley, their plans not involving the use of any of its property or corporate powers, there could be no possible breach of duty to any of the stockholders on the part of Baxter, Bowron, and Shook, the only defendants engaged in the effort, in not divulging their intentions and hopes, at least until their endeavors had reached such tangible measure of success that prudent men entrusted with the duty of determining whether a long-delayed purpose to build a town at Ensley, which must speedily commence operations if the Land Company would save its property, could fairly say that the risk of harm from delay in waiting for the steel plant would be more than counterbalanced by the reasonable prospect of gain if the plant were erected. Their efforts and intentions had not assumed anything like that vitality and form, when the trust was created and the trustees sold the 230 acres. Moreover, from what persons, who should have been informed, did they conceal their intentions? The only persons upon whom the authority and duty rested to sell the lands were the trustees, Bowron and Barker. Bowron knew all that had taken place, and so did Baxter and Shook, with whom Bowron was advising. The Tennessee Company, the holder of the majority of the stock, was fully advised. The fair inference is that Barker was not uniformed. Bowron conferred with him, and they at first declined the proposition, and inevitably, from the range of the discussion, as stated by Bowron, after considering the outlook of affairs, industrial and financial. Barker was the first president of the Alabama Steel & Shipbuilding Company, and naturally interested, as was every thoughtful man in the district, as to the prospect of establishing a steel plant there. It was certainly not good policy for those interested in the Land Company, certainly, not at any time prior to March, 1898, to announce to the general public the fact that they were making efforts to induce the Tennessee Company to reconsider its decision not to build at Ensley, and had strong reason for hoping they would be successful. They could not fairly or truthfully state the facts, without stating why they would make the

effort. The announcement of the attitude of the Tennessee Company at that time would probably have had more effect in deterring persons from investing at Ensley, who might otherwise do so, in the hope of the early building of the plant at Ensley, than would be attracted by the announcement of an adverse decision by the Tennessee Company, accompanied by an expression of enthusiastic opinion that it would be reversed. Under these circumstances the failure to inform the public, or the stockholders generally, and there was no one else concerned who was not fully informed, could amount, in no event, to more than a mistake of judgment, and furnishes no basis of a finding of a fraudulent concealment.

### The Ensley Company.

11. On demurrer to the amended bill, upon facts not materially different from the proof, it was said of the purchase from Mrs. Warner by the Ensley Company and the conveyance by it to Barker and Bowron, "as the law devoted the property to the very trust under which Barker and Bowron acknowledged they held it, the dealing with the Warner title in itself neither could nor did harm the corporation." Kessler et al. v. Ensley Co. et al. (C. C.) 129 Fed. 415. In this the court was only following the rule in Clarke v. White, 12 Pet. 178, 9 L. Ed. 1046, that:

"In equity, as at law, fraud and injury must concur to furnish ground for judicial action; a mere fraudulent intent unaccompanied by any injurious acts is not the subject of judicial cognizance."

Still, as that transaction, in view of the subsequent proposition by the Ensley Company and its purchase from the trustees, sheds light upon the frauds charged, it is necessary to examine it. The Ensley Company was organized December 21, 1897, with a capital stock of $42,000, all of which was subscribed in the name of Minor, except two shares in the name of C. A. Nolan and P. G. Shook. Its incorporation proceedings show that it was organized to buy this very land, and, among other descriptions of it, stated that it was the land purchased by Mrs. Warner at the execution sale. Mrs. Warner conveyed the land to the Ensley Company, December 23, 1897. The Ensley Company conveyed to Barker and Bowron by deed dated December 28, 1897, but which was, in fact, not delivered until the 6th day of January, 1898, at which time Barker and Bowron paid the consideration. The day after that the Ensley Company refunded to Minor, McCormack, and Ramsey the amount they had paid into the Ensley Company to raise the money with which Mrs. Warner was paid. On the 17th of January, 1898, after paying the expenses of organization, the Ensley Company divided the money remaining in the treasury in the proportion to the sums contributed, respectively, by Minor, Ramsey, and McCormack; the latter's share being $86.43.

McCormack says he knew the plan to induce all the judgment creditors to assign their claims to the trustees and wait until the lands could be sold had not been consummated, and that several of them had declined to come into it. He was familiar with Percy's opinion that the Land Company might not be able to redeem, if a judgment creditor

should redeem from Mrs. Warner, and he knew she would sell for less than the amount required to redeem, and that Hill, who was threatening to redeem, was endeavoring to buy for a sum less than the amount required to redeem, and had once or twice raised his bid. With a view to prevent this, he was at that time himself negotiating with Percy Warner who was willing to sell, because he (McCormack) wished to get the title in hands friendly to the Land Company and the Tennessee Company. He heard Minor had a sum of money he wished to invest, and he knew Minor was friendly to the Tennessee Company. He went to him, explaining the situation of the title, telling Minor that he would get 10 per cent. interest upon his money, in event he bought the property and it was redeemed, and, if it were not redeemed, he would get the land, which would be a good investment, and McCormack advised Minor to go to Barker, whose bank, Minor says, McCormack told him had the matter in charge. Minor went to the bank and put up his check for $17,000, the whole amount required to buy the land from Mrs. Warner. For some reason, which McCormack does not recall, the trade did not go through at that time, and the check was returned to Minor by the bank. About that time the Ensley Company was formed. McCormack states he had no idea at the time of acquiring any interest in the purchase, but that, after the Ensley corporation was organized, Minor declined for some reason to furnish more than one-half the necessary amount, and he induced Ramsey to furnish some of the money and he contributed the balance to make up the other half. He further says that after the Ensley Company had distributed all of its assets the idea occurred to him, as he had recently had some success in building a town, to purchase some of the property, and, as the corporation was already in existence, to utilize it for carrying out his plans.

Minor corroborates the statement that McCormack, at the time the company was formed, was not to have any interest. Minor says he intended to take the whole thing for himself and to let his two brothers share it with him. His recollection of the whole matter is hazy and quite indistinct. He says he did not charge his memory particularly with the facts, and left the whole matter of the negotiations to McCormack. He speaks of having the whole interest, both in reference to the time when he put up his check in bank and also as to the stock. Minor could not recall the reason Barker gave him why the $17,000 check was returned to him. He could not recall what Barker said to him, or, for that matter, what explanation anybody gave him why the trade did not then go through. He speaks of the Warner title as a mortgage. He does say that his conception of the whole thing was that the Ensley Company was organized for the purpose of buying 200 acres from the Land Company, and "that our company was formed for the purpose of buying that land, and that they proposed to buy from the Land Company." He admits his recollection "is indistinct and his conception of it may have been defective." He refers to a visit he made in company with A. M. Shook and others early in January, 1898, to the lands which he says the company was to buy. He admits he declined to go back into the company, after the money he

paid in had been refunded, because he estimated its proposal would require the expenditure of $50,000 or $60,000. He finally took 10 shares, paying one-half its face value in cash, with the understanding he would pay the rest, if called on. Putting the whole testimony together, the balance of probability from it is, when he speaks of the purpose of the company to buy the lands from the trustees, that he refers, not to the time when the company was formed, but to a time afterwards, when, the company having sold the lands to Barker and Bowron and returned the money contributed by the stockholders, McCormack proposed to him to take an interest in the proposal of the Ensley company to buy part of the lands. It is doubtful, to say the least, whether his testimony contradicts the truth of McCormack's statements that, when the company was formed and stock subscribed, no idea was then entertained of the subsequent repurchase from the trustees. Reading Minor's testimony does not give the impression that his vagueness of recollection was a subterfuge to avoid giving testimony which might injure the Ensley Company, though he was, as counsel very properly brings to the attention of the court, at the time of giving his testimony, an officer of the Ensley Company, and his holdings are now worth several thousand dollars.

The amount of the capital stock, does not seem to accord with the idea that the Ensley Company was formed solely to purchase this land and resell it to the trustees. The capital stock is fixed at $42,000. The incorporators knew it would not require half that sum to buy the land. It may be that the amount of the capital stock was thus fixed to enable it, if redemption were not made, the better to sell at a profit an interest in the venture to others, while retaining a portion for themselves. This is possible; but it is the only theory consistent with the purpose of organizing the company for the sole purpose of buying or holding these lands, to keep them in hands friendly to the Land Company.

McCormack gives the following explanation why the proposition to purchase 10 acres was not made at the same time with the other. He says he had not contemplated it at that time. Hill had not come into the trusteeship until February 11, 1898, which date is fixed by an entry in Bowron's diary. To induce Hill to assign his claim, an offer was made to him to take the interest on his claim, amounting to about $4,000, in lands. Hill and his attorney, Baxter, and others went out to Ensley, and McCormack went along. McCormack says Hill, standing on the porch of the old hotel at Ensley, told Baxter that he would take his $4,000 in 40 acres of land, to be selected by him around the hotel and including it. Baxter replied the 40 acres ought to bring more than that. Hill replied he would not give more. Then Baxter turned to McCormack, and asked what he thought of it. McCormack's reply was that the price was too low, and that he would give $4,000 for 10 acres, to be selected by him. Hill turned to Baxter and said: "Let the fool have it. As the holder of a claim against the Land Company, and as a stockholder in the Land Company, I say let him have it." McCormack says in that way his proposition first came to be made for the 10 acres of land, and he afterwards formally made

it to the trustees, and that it and his first proposition were considered one proposition, and Bowron says they were so treated.

The professed friendliness of McCormack to the Tennessee Company and the Land Company was not unnatural. He had long been an officer of the Tennessee Company, and was a director of the Land Company. It is not at all strange that he should desire to see them saved from loss. The incorporation of the Ensley Company was intrusted to the attorney of the Tennessee Company, who, as McCormack knew, had been working long and zealously to get the judgment creditors to consent to the trusteeship in order to save the property, and the papers showed on their face that it was being formed to buy these very lands. Would McCormack have gone to Percy, or have allowed Minor to do so, if he intended any wrong to the Land Company, in which Percy's client was the majority stockholder?

It is said, when the proposition was read by McCormack to the stockholders, that it was not, in fact, read or made in the name of the Ensley Company, as stated in the minutes, but really by McCormack for himself and associates, and that this goes to prove fraudulent intent. The evidence does not prove the statement that the name of the Ensley was suppressed at the stockholders' meeting. McCormack states that the proposition was made as that of the Ensley Company. The minutes of the meeting recite the same thing. Vail, the secretary of the Land Company, says that, in writing up the minutes after the meeting, he, not being familiar with the names, asked President Shook, whose proposition it was, and "upon Shook's statement the words 'Ensley Company' were written in the proposal and in the resolution adopting it." In another part of his testimony, Vail states that he may have asked Captain W. A. Walker, who presided over the meeting, as to the names, and gotten them from him. Vail was asked what "his best recollection was as to whether the proposal was made in the name of the Ensley Company," and answered: "My best recollection is in the name of the Ensley Company. My best recollection is that that is correct." Again, in another part of his testimony, in answer to the question: "Was the name of the Ensley Company ever stated at that meeting as the proposer of that proposition which you have read?" he answered: "I don't think it was; I don't remember to have heard it." Aldrich left after the resolution adopting the proposal was passed. He states no proposition was made while he was present on behalf of the Ensley Company, and that McCormack made the proposition in the name of himself and associates, saying he could not give the names of his associates, and that there would be five to seven, and that it had not been decided how many there would be. H. K. White says that his attention was attracted to Aldrich from the fact that he voted "no" on every proposition submitted at the meeting. Aldrich was opposed to the whole plan, and evidently more interested in the defeat of the trusteeship and the proposed purchase than in the name of the proposer, and the name may have been mentioned and escaped him. The substance of White's testimony on cross-examination is that:

"He did not hear McCormack assert that the proposition was made in the name of himself and associates, but, hearing him read the proposition, his understanding was that he was making it in behalf of himself and associates, and that he gathered that understanding from McCormack's reading the paper and his remarks and those of Col. Shook thereon."

Bowron states, when the proposition was delivered to him, he knew it was from the Ensley Company. In view of this testimony, it certainly cannot be affirmed that the Ensley Company's name was not mentioned at that meeting. Vail, whose duty it was to keep the minutes, and keep them correctly, was testifying seven years after the event. The minutes were signed as correct by Capt. Walker, who presided at the meeting, when the matter was fresh in men's minds. Walker died before the taking of the testimony began. It is difficult to understand or to reconcile Vail's testimony in one place, that his best recollection is that the proposition was made in the name of the Ensley Company, and that that is correct, with the further statement thereafter that he does not think the name of the Ensley Company was stated at that meeting as the proposer of the proposition, and that he does not remember to have heard it. His recollection even of his own recent testimony was bad.

What plausible hope could McCormack entertain that, by failing to speak of the Ensley Company at that meeting, he could hide his connection with it? The organization of the company and the purpose for which it was formed, as well as its conveyance to Barker and Bowron, had been spread upon the public records fully a month before the meeting. At that very meeting, and prior to the making of his proposal, a resolution had been adopted, reciting the sale under the Warner judgment, and that Barker and Bowron are now the owners of the land, and the deed had been on record some time showing how they became owners. The language of the proposal, as McCormack read it, "We will guarantee, we will build," etc., in connection with his statement that it had not been determined how many associates he would have, could not possibly have left the mind of any man in doubt that McCormack himself was interested in the proposition, no matter in whose behalf it was presented. The suppression of the name of the company at the meeting, when he knew in a short time thereafter, if his proposition were accepted, the Ensley Company would be found in possession of the land which he had proposed to purchase in another name, and carrying out his undertakings, was sure to stimulate and provoke inquiry as to his relations to it. A sensible man, under such circumstances, would not have thought it worth while to suppress the name of the Ensley Company in connection with the proposal made, and a cunning man would have known, after his statement as to what he and his associates proposed to do, that it was worse than a useless subterfuge to hide his connection with the Ensley Company, if it went into possession of the very lands he proposed to buy and began to carry out the undertakings mentioned in the proposition. The failure to disclose his associates was of no significance, so long as they were not persons occupying fiduciary relations to the Land Company. He probably did not know at that time who would go in with him after Minor had concluded not to join.

It is urged that the transaction bears the earmarks of fraud, because Bowron did not know who conducted the negotiations for the conveyance to him and Barker by the Ensley Company. It is quite evident, however, from the whole transaction, and the testimony of Minor, that the conveyance was drawn by the attorney of the Tennessee Company, who was also the attorney of the Ensley Company, who knew of the understanding and the purpose for which the property had been bought. Minor states he paid little attention to the matter, and that, when the conveyance to Barker and Bowron was handed to him as president, he signed it because the papers were handed him by Messrs. Percy and Grubb. Those gentlemen were the attorneys of the Ensley Company and the attorneys of the Tennessee Company, who had been active, in the interest of the Land Company, to put the title in such shape that the Land Company would not lose the property.

It is urged that it is another badge of fraud that McCormack said that he did not know who procured Mrs. Warner to make the deed to the Ensley Company; but this criticism is based on an answer to a question which McCormack failed to understand, and which, when explained to him, he answered, and stated, in substance, that he caused the conveyance to be made by Mrs. Warner to the Ensley Company. Another criticism of McCormack's conduct is based upon the fact that Bowron testified when he heard the cash would be required to take the title from the Ensley Company he was shocked. Shook says, and Bowron corroborates it, that two or three days before this he informed Bowron that such would be the case. Shook had been active in procuring the trusteeship, and knew the fact, and he was informed. Moreover, the evidence does not disclose that Mrs. Warner ever contemplated transferring her title to the trustees and waiting for her money until they could sell the lands. She was no longer a judgment creditor. She had title, and had gone in possession for herself alone. She could not possibly be disturbed, except by some person redeeming and paying her the cash. Her son and agent was not considering going into the trusteeship, but was seeking to convert the land into cash, either by sale or inducing Hill or some other creditor to redeem. There is nothing in the record which justifies Bowron's expectation that she would assign her title to the trustees and wait until they could sell lots. It may be that McCormack, apprehensive, as he states he was, that the plan for the trusteeship would not go through, did what he thought was best for the company, although it might result in disappointing the expectations of Bowron, who states that he had never negotiated with her. The transaction is also criticised because the deed was made to Barker and Bowron individually, and not as trustees. It is quite evident from all the facts and circumstances that the intention all the while was to vest the title in the lands to them in trust. All the creditors had not at that time assented to the plan, nor had the priorities been adjusted, and the purpose could better be effected by a declaration of trust, made in pursuance of formal recognition of the trust by the stockholders at the contemplated meeting which had then been called, but not held, than at the time the conveyance was made to Barker and Bowron, individually. The prompt conveyance of the title to

Barker and Bowron and the amount of purchase money exacted shows that the purpose was to get the property where it could be held for the benefit of the Land Company, and at no greater cost than upon redemption by the company from Mrs. Warner.

Another badge of fraud relied on is that the company after the sale to Barker and Bowron distributed all of its capital. This is not inconsistent with, but rather supports, the claim that at the time McCormack had no intention to utilize the company to purchase any part of the property from the trustees. If there had been, at that time, a purpose to make the proposal, the carrying out of which would have necessitated the use of more money than the Ensley Company had, as afterwards happened upon the purchase in the name of the Ensley Company from the trustees, it would have been a very unnecessary proceeding, from a practical business point of view, to distribute all of its money to the stockholders, and, if money was to be put in again, and stock given for it, it would have been more than useless in putting inquirers off the track as to the parties interested in the company, when that fact must necessarily be disclosed by the subsequent issue of stock, if McCormack or Minor or any one concerned in the formation of the organization afterwards took stock or had to do with it. The sum and substance of the whole transaction was that the property of the Land Company was put where it ought to have been put, and that McCormack made the proposition of purchase openly to those in whom the title was finally lodged, beyond his control, by the conveyance from the Ensley Company. In the light of all these things, if we observe the rule that we "ought not to suppose fraud, when the facts out of which it is supposed to arise may well consist with honesty and pure intention," how can we say that the circumstances attending the organization of the Ensley Company and the incidents of its sale to the trustees show fraudulent intent in doing those things? How can we find, if suspicion arises that the Ensley Company was first formed with bad motive, that it had not been abandoned at the time the Ensley Company conveyed to Barker and Bowron? Whatever suspicion, or however just, may be aroused by the transaction, it is unquestioned, under the evidence, that the other defendants were in no wise interested in the matter or cognizant of it. It is no longer of consequence, for "in equity as at law, a fraudulent intent is not the subject of judicial cognizance unless accompanied by wrongful act."

12. It is insisted that the lands were sold to the purchasing defendants at a grossly inadequate price. The entire tract of 3,790 acres brought, at sheriff's sale, a little over a year before, less than the cash the trustees received for the 230 acres. Although there were a number of judgment creditors who were anxious to collect something on their debt, none of them were willing to redeem from Mrs. Warner, though at least one of them was seeking to purchase from her for less than the amount of her bid, at the time she conveyed to the Ensley Company. To the amount of cash received by the trustees must be added the further consideration of the undertakings of the Ensley Company. These, the witnesses estimated, would require an expenditure of $50,000 or $60,000, which would go to enhance the values

of the residue of the property. A number of shrewd business men about Ensley and Birmingham, whose names are given, and some of whom were examined, being offered an interest in the purchase, declined, thinking the investment a very doubtful one. The mining and mineral rights in the property being reserved, it had no active value, except as ordinary farm lands. Its value aside from that attaching to ordinary farm lands, five or six miles from a city, depended upon the degree of probability, at the time of the sale, of the successful revival of the effort to build a town there, and was, therefore, contingent, and largely speculative.

We pass without much discussion the figures at which the Tennessee Company valued their stock in the Land Company in the former company's balance sheet of debts and resources, and the figures at which Mrs. Warner gave in the property for taxation. Neither is a very satisfactory or reliable guide. She assessed the entire body of lands at $19,000. It is hardly probable, even with the loose ideas obtaining in this state as to the duty to give true values, that the assessor accepted an assessment of only one-third or one-fourth of the value of the whole tract. When Hillman, a former president of the Land Company, wrote the Central Trust Company under date of January 12, 1898, urging the sending of the proxy to Shook, he asks that it be done for the purpose of reviving the Land Company, "and enabling it, if possible, to come clear of its difficulties, so that the stock in your hands may become an asset of real value." The feeling among many people familiar with the property was expressed by Percy Warner, who, explaining why he declined to take stock in the venture, said that he had been operating the street railroad out there without returns for some time, and it "looked pretty dead to me." The prices obtained for lands there, after it was known that the Ensley Company had undertaken to start a town, and commenced operations, and especially after the impetus imparted to values by the knowledge of the intended erection of the steel plant, are not a fair basis upon which to estimate proper prices, at a time when neither of these considerations entered into the estimates of value. Aside from this, unless there is other proof of fraud, inadequacy of price, unless it is "so great as to shock the conscience," is not a fact from which fraud may be inferred. Graffam v. Burgess, 117 U. S. 180, 6 Sup. Ct. 686, 29 L. Ed. 839. After a careful examination of the whole evidence the court is of opinion that the price paid, together with the considerations agreed to be paid in the different undertakings of the Ensley Company, was the fair value of the 230 acres at the time of the sale.

13. It is urged that the trustees made a private, and really a secret, sale to purchasers, who knew, when the public did not, that the property which had then been withheld from the market for years would be for sale. This is not borne out by the facts. The power under which the trustees acted, which the Land Company fully ratified, gave them authority and discretion to make private sales. The stockholders and creditors of the company, and, for that matter, the general public, who were at all familiar with local affairs about Birmingham and Ensley, knew the Land Company's troubles with its creditors alone kept the

property off the market, that its creditors had been pressing it vig. orously to collect these debts, and that, when the trusteeship was com-, pleted, the creditors and company alike would desire to sell lots as soon as practicable. Notice of the meeting which was held January 25, 1898, which was published nearly a month before that meeting, in a morning daily paper at Birmingham, expressly stated that it was called to dispose of a plan "looking to the sale of the lands," etc., "for the purpose of liquidating debts." The declaration of trust, which made it the duty of the trustees to make sales of lands, was of record. The purchasers here, although the company had not then the title, recognized the stockholders as the real owners, and the offer of purchase of the lands was publicly made to them at a meeting convened to determine how they should dispose of the company's property. It was not accepted until a month later. By a vote which was practically unanimous the stockholders recommended to the trustees to trade along the lines of the proposition. Not only did the holder of the majority of the stock vote in favor of the proposition, but all but one of the few other stockholders who attended the meeting. It was not a sale of the entire property in bulk, but of a comparatively small portion of the entire tract, which was parted with at a fair price, in order to start the town and put the enterprise upon its feet, so to speak, and to bring about a demand for the rest of the property. Under the circumstances the fact that the sale of a portion of the property which had been intended for the town site was made by acres, instead of by lots, was immaterial. At that time the owner of the property had not recorded any map of these particular lands, and blocks and squares were theoretical, rather than real, and no fairer average measure of value than acres. Hopper v. Hopper, 79 Md. 400, 29 Atl. 611. It is true, that the sale of the ten acres was not submitted to the stockholders, but the circumstances under which it came about, which transpired subsequent to that meeting, have been shown in another part of this opinion. It is urged that this was the most valuable part of the land, but that would not matter if a fair price was exacted, and besides, several of the witnesses state, they spoke of it in that manner, because the starting of the town at that point, and building it up there, made that part more valuable than the rest, and this consideration aside, there were other portions which were not sold, fully as valuable.

14. Much evidence has been taken as to the compliance on the part of the Ensley Company with its various undertakings. It did effect sales of lots, put up the agreed number of houses, located a drugstore, and brought about the erection of a brick making plant, a planing mill, a lumber yard, built a supply store, and made other endeavors to attract industries there. There is dispute whether some other industries claimed to have been located by the Ensley Company were not really brought there by the building of the steel plant, and the evidence favors the latter view. Other unperformed undertakings were dependent upon the making of molten steel, which has not yet been made at Ensley. The quantum of compliance, save as it may show fraud in the inception of the purchase, is not matter of importance in the present phase of the question. There is no evidence of bad faith on the part

of the respondents in performing other undertakings. The real attack of the complaint as to the improvements which were made by the Ensley Company is that they were accomplished by the fruits of the trade, the expenditures being from profits, which it is insisted equitably belong to the Land Company.

15. Prior to February, 1897, John W. Gates, of Chicago, a capitalist interested in steel properties, visited Birmingham, and made a proposition to the Tennessee Company looking to the building of a steel plant in that vicinity. In discussing the matter, he expressed great preference for a legislative charter over one taken out under the general law. The negotiations came to naught, but the officers of the Tennessee Company, with whom the negotiations were had, deemed it desirable to have a special charter available for future use, and accordingly procured the passage of the act incorporating the Alabama Steel & Shipbuilding Company, approved February 18, 1897; Baxter, Bowron, and McCormack being named among the incorporators. This charter was approved eight months before Shook became president of the Land Company, and a year before the trustees sold to the Ensley Company. Certainly it could not have been foreseen then that the Tennessee Company in December, 1898, would first determine to aid the steel plant at Birmingham, and that defendants in January, 1898, would endeavor to get it to reconsider that decision. In view of the statements of the bill that the plot was formed in the latter part of the year 1897 or early in 1898, the taking out of that charter, early in 1897, does not go to show a purpose, at that time, to make the sale to the Ensley Company a year later, and to make it more profitable to it by voluntary efforts on their part to build a steel plant at Ensley, without the help of the Tennessee Company, and in the meantime to keep knowledge of their intentions as to the steel plant from the public. It illy comported with the idea of concealing defendants' intentions as to the steel plant to procure a legislative charter for such a purpose, in which defendants were named as corporators, with the publicity attending legislative proceedings and the printing of that charter in the laws of the state. The procuring of that charter is rather an open manifestation and avowal by the defendants, as far back as February, 1897, of their purpose to build a steel plant at the very first opportunity, whether or not they then entertained the purpose to make the sale to the Ensley Company a year later. The use of the charter eighteen months after its passage, by the Tennessee Company as a matter of convenience in adjusting its securities, under these circumstances, does not go to show bad faith of the defendants.

16. One badge of fraud relied on is that P. G. Shook is the son of president A. M. Shook. It is quite apparent from the recital that has been given of the history of the Ensley Company that P. G. Shook was selected as a nominal holder of one share of stock for convenience of organization, he being an employé in McCormack's office, and that originally he was not to have any interest whatever in the transaction. It was afterwards that his small holdings were taken. His father furnished none of the money, and it does not appear that he

knew his son was to have any interest at the time, if he knew he was an incorporator.

The bona fides of the judgment in favor of the Birmingham Railway & Electric Company, under which Mrs. Warner sold the property to the Land Company, is not questioned, and cannot be. It is true, at the time it was rendered, A. M. Shook was a stockholder in that company, and so was Warner. Shook, at that time, had no official relations with that company, and the judgment was transferred to Warner, after being held for some time by the company and others. Warner's will shows that Shook was one of three friends with whom he advised his widow to consult in case of need. Shook testified that he did not confer with her, she being very deaf, but advised with her son who had charge of the collection, and told him to hold on to the judgment, as the debt was undoubtedly good. If any inference can be indulged, in view of Shook's testimony and that of Percy Warner as to how Shook's relations influenced the conduct of the owner of the judgment, it is that it was exerted in delaying the collection, for it was rendered nearly four years before the execution sale. The testimony of the attorneys who had charge of the collection of the judgment, and caused the levy and sale and conveyance, shows they never had any communication whatever with either of the defendants on the subject, or were ever advised or solicited by them in any way to make the sale, and that they themselves were acting under the direct order of the owner of the judgment.

17. From this extended review it clearly appears that the defendants did not mismanage the Land Company, or in any way bring about the distress or pressure which necessitated the creation of the trusteeship; that they were not guilty of any fraud or concealment in planning it or procuring its adoption by the stockholders, or moved by any improper motive in the selection of the persons to whom the trust was confided, and that they did not withhold any information from any one authorized to speak for either corporation, or who should have been consulted; that the trusteeship was a necessary and prudent step to avert a crisis in the affairs of the Land Company, and save its property; that defendants were in no way instrumental in preventing the Tennessee Company from coming to the aid of the Land Company, but, on the contrary, availed themselves of the aid of the Tennessee Company as far as they could; that the defendants were not guilty of any fraudulent concealment of the prospects of building the steel plant, and not at fault in not making known the determination of the Tennessee Company which had not then been formed with reference to the enterprise; that the sales complained of were made openly, and not secretly, and for a fair price. It is also proved by the positive testimony of Baxter, Bowron, Shook, and McCormack, and by the stock books of the Ensley Company, and by all the evidence which seems to have been in their power to produce, that neither Baxter, Bowron, nor Shook were ever, at any time, directly or indirectly, interested in the Ensley Company, or in McCormack and Ramsey, or in its or their purchases. It is not pretended that Barker ever had any interest. There is the most explicit denial of any combination or conspiracy,

express or implied, to enable McCormack or Ramsey or the Ensley Company to acquire the lands secretly, or unfairly, or at less than their value. It does not appear that either of these defendants were of kin or related to McCormack or Ramsey, or in any way interested with them, or that Bowron, Baxter, Shook, or Barker, or either of them, had any motive to injure the Land Company or the Tennessee Company, or to blacken their good standing among men by wrecking the affairs of the Land Company, or that they were in any way in the power of McCormack, or were in financial distress, or controlled by any motive or surroundings which could tempt men in the high places they held in the industrial world to act treacherously in the execution of an honorable trust, in order to put money in the pockets of the Ensley Company, Ramsey, or McCormack, or either of them. Every syllable of the positive testimony supports the denial of defendants of any combination, fraud, conspiracy, of interest with the defendants. There is nothing which can be brought forward to impugn the truth-fulness of these statements of defendants, except such inferences as may be legitimately drawn from their various acts, which have been reviewed above. The harshest judgment which can be passed upon those acts cannot justify the finding of any kind of fraud or bad in-tentions on the part of the selling defendants, but, at most, involves them only in errors of judgment. Unless, therefore, the court pro-ceeds upon the theory that Baxter, Bowron, and Shook, being human, could have sinned against their corporation, and therefore did sin against it, in effecting the trusteeship, or in making and advising the sales complained of, it is impossible, under any legal or moral rule for weighing men's conduct, to find them guilty, under this evidence, of any actual fraud or bad intentions in their several or combined parts in the transactions. What possible motive, under the evidence, could have possessed Baxter, Bowron, or Shook or Barker to conspire with McCormack or desire to despoil the Land Company for his benefit? Baxter, Bowron, Shook, and Barker not being guilty of fraud, or cove-tous, or impure motive, in these transactions, it is impossible for them to have connived or conspired with McCormack. Without their guilty concurrence, it is impossible for McCormack to have com-mitted the frauds charged against him, whatever may have been his motive or interest, if we solve all doubts on these points against him. There is not a particle of evidence that Baxter, Bowron, Shook, and Barker were deceived. They acted deliberately, in full consciousness of the situation with which they dealt, and with knowledge of all the facts that entered into the measure of their obligations to the Land Company, its creditors, and its stockholders.

18. Under the terms of the deed of trust it is provided that Barker and Bowron are not to charge any fees or commissions for their ser-vices, but may pay others for reasonable expenses in aiding them in the administration of the trust. It is further provided that "said N. E. Barker and James Bowron shall not be held liable or responsible for the consequences of any act, done or omitted to be done in good faith, but shall be liable only for willful neglect or misconduct," in the dis-charge of their duty. Counsel for complainants speaks of the limita-

tion and powers in the declaration of trust as "self-declared," and therefore without efficacy. The deed from the Ensley Land Company to Barker and Bowron as trustees recites that the Ensley Land Company, being largely indebted, etc., "has caused and procured the said N. E. Barker and James Bowron to make a declaration of trust securing said indebtedness." The declaration of trust standing alone was a mere proposal. The stockholders of the Land Company had the right to accept it. They did accept it, and when they deeded the property to the trustees, to be dealt with according to the terms of the trust, that declaration became part of the contract between them and the Land Company as to their powers and liabilities. It was a private, not a public trust. It was not against public policy to limit the liability as there declared. The Land Company has fully ratified the trust and its terms, and it is now too late for it or its stockholders to complain. The private sales complained of were not only not illegal, but were authorized, and there is nothing to show that they were made in fraud or bad faith. The trustees were not bound to advertise before accepting the first offer of sale or making other sales. Whether they should do so or not was a matter of discretion and judgment which the trust left to their determination. The same considerations apply to the time when the property should have been put upon the market, and whether it was wise or not to accept the offer of the Ensley Company and McCormack and Ramsey, instead of awaiting the outcome of the efforts to build a steel plant.

From what has been said of the failure to make known to the public the probability of the building of the steel plant, the most that can be said of the failure to advertise that fact after the Ensley Company went in possession is that it was an error of judgment. The evidence shows that the newspapers published the fact that the Ensley Company would begin the building of a town there, and the number and kind of manufactories and other enterprises it had agreed to start there. Ensley itself had been advertised for years. There is nothing to show that, in fixing the price of lots to be sold by the Ensley Company on account of the Land Company, the trustees did not take into consideration what they knew about the building of the steel plant. The trustees were not invested with any power or charged with any duty to collect the alleged indebtedness of the Tennessee Company. The omission to incorporate in the conveyance to the Ensley Company, or to otherwise take an obligation of the Ensley Company to carry out its undertakings, was, notwithstanding the broad limitation of liability, so plainly a duty that, if intentionally omitted to be done, it was not an act omitted to be done in good faith. If inadvertently done, it was such gross negligence as to amount to willful neglect within the meaning of the declaration of trust. It was as negligent a breach of duty as if the trustees failed to try to collect a note until it was barred. This omission is not excused by the fact that the trustees believed the cash offer for the land was a good bargain by itself, and did not relieve them from the obligation to take all proper steps to make this part of the proposal legally obligatory.

The matter, however, is no consequence now. Aside from the ques-

tion whether the nature of the undertaking was not such that damages on its breach were purely speculative, the evidence shows that the Land Company has elected to waive its performance. One of the terms of this proposal, the performance of which was part of the consideration of the trade, was that the Ensley Company should have the exclusive right to sell the lands which should thereafter be put upon the market, at prices fixed by the trustees, for a certain commission. That stipulation went to the entire proposal. Under it neither party could compel performance unless that other party performed on his part. The Land Company did not choose to stand in the shoes of the trustees in this respect, and cannot recover any damages of the Ensley Company, when it elected to take the sales of the lands out of their hands, and ceased to pay commissions to the Ensley Company. The proof, therefore, discloses nothing for which the trustees can be called to account as for a breach of trust. Under the review we have given of the evidence it also results that Baxter, Bowron, and Shook are not liable, as directors, for what they did in the creation of the trust or in aiding or advising the trustees in the selection of the lands sold, or the prices to be obtained therefor, or for not collecting the alleged indebtedness from the Tennessee Company.

19. In the vision of after events, all can see now that it would have been far better to have delayed placing the lands on sale, after the title came into the hands of the trustees, until the outcome of the efforts to erect a steel plant at Ensley should be known. Similar undertakings, under as favorable auspices, had failed before. The trustees at first declined acceptance of the offer, and demanded better terms, to which there was a refusal to accede. The time had come, in their opinion, when they must act one way or the other. One of the trustees had no prior connection with either of the companies, and after conference, which we do not doubt was honest and conscientious, agreed with his co-trustee as to the advisability of the acceptance of the offer. The times were then unsettled. The country was on the brink of war with Spain. No one could predict what conditions would arise in the near future, and what industrial and financial conditions would result, or what effect they would have upon the building of a town at Ensley. The Land Company had been ill-starred and subjected to many vicissitudes. Creditors, who reluctantly yielded indulgence, were clamorous for their money. They had put the property in the hands of trustees to turn it into money, with the legal and moral understanding that it should be done as soon as practicable. Interest was eating into the property at the rate of over $800 a month, and delay was costly. Prudent men, under such circumstances, might well have deemed it the part of wisdom to begin selling at the earliest fair opportunity, and to take the proverbial bird in the hand, which is worth two in the bush. Courts are never harsh with honest trustees about mistakes in reading future events, or the effect they will have on business committed to their charge.

20. Did McCormack occupy such relations to the Land Company at the time of his negotiation and purchase as justifies or permits a court of equity to set aside his purchase, although there be no actual fraud?

141 F.—11

A director acting openly may purchase for himself from a board of which he is a member, they not being interested, if he does not assume to act for the corporation and his colleagues do not rely upon him. Such purchases, while of evil tendency, are not absolutely forbidden, or regarded as carrying such weight of adverse presumption as makes them constructively fraudulent, and therefore to be set aside, as, of course, on seasonable objection. When assailed, they will not be upheld, unless it can be shown that the transaction was not effected by fraud, and that the scales by which the bargain was weighed were not tipped in the director's favor by the influence of the relation, or by his use of any information, which was not equally possessed by those with whom he dealt. A director who buys corporate property of his fellow directors does not take his purchase wholly without the reason of the rule, merely because his proposal, made while he was yet in office, did not ripen into a contract until its acceptance a few weeks later, when he had ceased to be a director. Whether or not such dealings can stand depends upon the facts of each particular case. Williams v. Powell, 66 Ala. 20, 41 Am. Rep. 742; Daniel v. Hill, 52 Ala. 430. The familiar reason of the rule is that a director, whose position proves alike confidence reposed and ability to influence, having dealt for his own advantage with one by whom the confidence is extended, may have exercised that influence contrary to the purpose for which the law created the trust, and therefore his acts, like those of any person who stands in fiduciary relations to another, will not be sustained when questioned in a court of equity, unless it appears that he has not used his position, intrusted to him solely to advance the welfare of the corporation, to unfairly promote his own personal gain.

In the case of a purchase by a director from a trustee, whose selection he did not influence or control, who was chosen by creditors and stockholders to hold corporate property in trust to sell to pay debts, the reason of the rule and presumption it indulges, in contracts by a director with his associates, or with stockholders, does not exist. The relation between a director and such a trustee is not one in which confidence is given and reposed between them. No power is vested, no duty is imposed, and no confidence is reposed, in the director as to the sale. The duty and the confidence are reposed elsewhere—in the trustee, not in the director. There is no presumption of law that a trustee so situated will subordinate his judgment and will to the influence of a director or former director. When the director makes, and such a trustee accepts, an offer of purchase, the burden of showing that improper influence moved the trustee in making the contract is upon him who assails it. There is a burden resting upon the director-purchaser, not on the ground of any trust or confidence in the matter of the sale, but because he stands in fiduciary relations to the corporation, as to his dealings with its property, and has therefore to show that, in his contract with the trustee, he did not avail himself of any information which was not equally possessed by the trustee. With this one exception, the director stands, as regards the presumption of influence over such a trustee, as any other purchaser would stand on that issue. Close relation by blood, family ties, and the like, between

the purchaser and the trustee may always be shown, in connection with the other facts and circumstances, to impeach the bona fides of the sale and so here the relation between Bowron, Baxter, Shook, and McCormack, while they were directors of the Land Company, or the relations of the trustees to him, then or afterwards, taken in connection with the whole case, should be looked at in determining the bona fides of the sale.

The court does not doubt that McCormack was imbued with the firm belief that a steel plant would be built at Ensley, if not by the Tennessee Company, by some one else, at some indefinite time, in the not distant future, and that he considered the chances of that probability bcoming a fact, in weighing the advisability of his venture, and was willing to risk his money, in any event, but thought his purchase would be more valuable, because a steel plant would be built there in the near future. His proposition distinctly shows that he had this in mind. The very terms of it suggested to the stockholders' meeting his belief that sooner or later a steel plant would be built there. The fifteenth proposition of the Ensley Company reads:

"If found practicable, and molten steel is sold to us at reasonable prices, we will cause to be built a plant for the manufacture of steel castings."

This does not necessarily show, however, that McCormack knew or believed at that time that any proposition had assumed definite shape as to reconsidering the determination of the Tennessee Company to build a steel plant at the Birmingham Rolling Mills. Molten steel, with modern appliances, may be safely carried some miles by rail from the place of manufacture to the place where it is to be utilized for the finished product. McCormack states that he had this in mind when he spoke of steel being sold at Ensley, and that he believed, at the time of his proposal, that the building of the steel plant at Birmingham was an assured fact, and that the Tennessee Company was under contract not to build one for itself for a term of years. He states he knew nothing "of any further efforts being made by the Tennessee Company's officials than they had been making for many years to procure the capital to build a steel plant." It is not shown that, in his efforts to induce persons to go into the Ensley undertaking, he mentioned any knowledge or information as to the early building of a steel plant there, which would have been probable, had he known that the building of the plant at Ensley had been definitely determined on or was assured. The governing committee of the Tennessee Company, of which he was a member, was charged with duties only as to the physical condition of the property, and the building of the steel plant was not within its province, and he had nothing to do with the correspondence on that subject. Bowron, it is true, had conversed generally with McCormack on the subject of a steel plant, but the inference from his testimony is that this was some time before he wrote the letter asking the New York office to turn the officers loose. It is not an unfair presumption that McCormack knew in a general way, though perhaps not just at the time, what Bowron and Baxter were trying to do. Whatever information he had, he gained otherwise than in the exercise

of any office or duty entrusted to him as a director in the Land Company. He knew the Tennessee Company had declined to build at Ensley, when the Ensley Company made the deed to the trustees, and when the Ensley Company purchased from them. He knew, if he knew all that was going on, that the effort to build a steel plant at Ensley had not taken practical shape and form, and that its success depended upon raising money from outside sources, and that not a dollar had then been subscribed.

If the rights of the Tennessee Company and the duties he owed it are material here, it suffices to say that the persons with whom he dealt in the Land Company trade were the very persons who were making the effort to build the steel plant, and knew far more about the matter than he did. There was nothing he could tell them. The reservation of the Tennessee Company for a steel plant at Ensley, and where it was located, and its situation with reference to the lands of the Land Company had been known for years, and were matters of common knowledge there. There was no unknown quality in the lands, or special use to which they could be put, or hidden elements of value in them. Any one could tell about these things by going over them. The value of the land was not at all uncertain or doubtful, save as that value might be affected by a demand for its use for town lots, and the prospect there was for that demand. McCormack had been appointed a member of the committee, in 1895, to select such portions of the company's lands as it might see proper to offer for sale, and in 1897 he was one of a committee to arrange terms of settlement of the company's debts. No selection of lands was made, nor was anything done by that committee as to a settlement of the debts. The formulation and execution of a plan of settlement under the resolution of 1897, was intrusted to the attorneys of the two companies and to the defendants, Baxter, Bowron, and Shook. McCormack's knowledge as to what was transpiring as to a settlement with creditors could not, of course, shed any light upon the value of the lands. Baxter, Bowron, and Shook had long been connected with the Land Company, and were entirely familiar with its property. They had gone over it about this very time, to induce a creditor to buy portions of it, in part settlement of his claim. They were cognizant of all the conditions present or prospective which might give it value. They had as much knowledge and as much capacity, if not more, than McCormack had, to determine the value of any part of the lands and every question which entered into it. McCormack made his proposition formally to the stockholders while he was a director, in terms which left no doubt that he was interested in the Ensley Company. He repeated his proposition to Bowron for the Ensley Company. He made his own proposition for 10 acres in his own name, when he had ceased to be a director. The two propositions were treated as one, and accepted at a time when his only relation with the Land Company was that of a small stockholder. His former connection with the company, as a director, is therefore material, under the evidence, only to aid in determining the fairness of the trade, in so far as his former relations with the trustees might improperly influence them, and in that it placed the duty on him not to

conceal any fact material to the value of the lands in dealing with them. There is nothing to indicate, in the slightest degree, that he was ever so close to Bowron and Barker, or to Shook and Baxter, who advised with them, as to give him any influence over them, or which would enable him to control their independent exercise of judgment, or in any wise undermine their firmness or sense of obligation to their trust. McCormack presented his proposition to Bowron on the 26th of January, 1898. Bowron states that he took the proposition to Barker, his co-trustee, and discussed it with him for "three-quarters of an hour," being personally in favor of its acceptance. Barker admitted the advantages of the proposition, but thought it desirable to trade, on the basis of retaining for the benefit of the trust, some interest in the profit to be made by the Ensley Company on a resale of the lands. Bowron returned and asked McCormack to concede to the trustees some share of his profits. McCormack took the proposition under advisement. Nothing further transpired in the matter for a month. On the 24th of February, 1898, McCormack advised Bowron that " his proposition could have acceptance or rejection of the trustees as it was." Bowron states the Maine had been blown up in Havana Harbor, stocks were dropping in New York, and capitalists were calling in loans, and he felt the more disposed to accept the proposition, which would relieve the trustees from their obligation for money borrowed from Barker's Bank to pay the Ensley Company, on a note of the trustees indorsed by the Tennessee Company, and would give them enough "spot cash" to put the trustees "in a position of safety." Barker, considering the circumstances and that the proposition was approved by Shook, the president of the Land Company, and Baxter, the president of the Tennessee Company, the parties most largely interested in the Land Company, decided to join in making the sale, and thereupon McCormack was notified of the acceptance of his proposal. It does not appear from the evidence that he importuned either of the trustees to accede to the proposition while it was under consideration. He simply stood fast to his first proposition, and declined, when asked to recede from it.

From the whole testimony it is apparent that the acceptance of his proposal was the deliberate act of the trustees in the exercise of their judgment, after full discussion of the whole subject, in plain view of the situation, as the best thing to do for the company and its creditors. Having made his offers openly, not possessing, and not having exercised, any improper influence on the trustees, and having made no misrepresentations, having utilized no information gained in the service of the Land Company, or elsewhere, which was not equally open and present with the trustees, and having paid a fair price for the lands, the court cannot strike down his bargain on account of his having recently been a director, unless it rules, which is not the law, in the absence of statutory regulations, that a director is not permitted under any circumstances to make an open purchase of property from trustees, who have it in charge to sell, for the payment of debts. No stretch of his former fiduciary relations could make it his duty to plead with the trustees to reject his proposition, or to warn them that possibly he

might make a large profit out of the transaction. That very question was in the minds of the trustees and caused them to deliberate a month before accepting his proposal. They considered the quantum of profits, and withheld acceptance of his proposition for a time while they weighed that very matter. It is not a fact, and no court holds, that the influence of the relation of a former director with trustees, appointed as these were, exists in anything like the degree presumed between guardian and ward, shortly after the termination of the relation. Even if the transaction here had been between guardian and ward, soon after the relation terminated, it could not be overturned under the doctrine of Malone v. Kelley, 54 Ala. 533, Daniel v. Hill, 52 Ala. 431, two great judgments delivered by the late Chief Justice Brickell, which are now landmarks in the jurisprudence of Alabama. It is not necessary to inquire whether, in a suit like this, in right of the Land Company it could rescind a sale for violation of fiduciary duty which a purchaser owed not to it, but to one of its stockholders individually, by reason of relations of the purchaser with that stockholder. Assuming that it may, it is clear that the representatives of that stockholder in this case knew everything that McCormack knew, and of his efforts to make the purchase, that no deceit was practiced, and it further appears that that stockholder, the Tennessee Company, although invited by this bill to join in the complaint against this sale, has not thought proper to do so.

21. In Foster v. Mansfield Railroad Co., 146 U. S. 99, 13 Sup. Ct. 28, 36 L. Ed. 899, it is said:

"The defense of want of knowledge on the part of one charged with laches is not easily made, easy to prove by his own oath, and hard to disprove; and hence, the tendency of courts in recent years has been to hold the plaintiff to rigid compliance with the law, which demands not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts."

It is not to be supposed that complainants purchased their shares without inquiring what property their company possessed, and what gave it value. They held both old and new shares, and knew there must have been a tremendous loss, or shrinkage in value, to require a reduction of the capital stock from $10,000,000 to one-twentieth of that amount. They knew the Land Company had never paid a dividend. They knew that the value of the company's property was largely speculative, and that the enterprise, from its very nature, would be subjected to many hazards in the trying industrial and financial conditions through which the country was passing, during the period in which the transactions now complained of occurred. The property went into the hands of trustees in January, 1898, to sell for the payment of the company's debts, with the sanction of its stockholders. The trustees made sales and remained in possession nearly a year and a half, when the Land Company, with the help of the Tennessee Company, paid off its creditors and came to its own again, and continued its enterprise. All the while the purchasers were improving the property. The building of the steel plant, the object of so much solicitude and fruitless endeavor, had come to pass in 1898. Manufactories sprang

up and residences and business houses displaced the woods and occupied the fields, and several thousand busy people dwelt, in 1902, near the spot where Ensley uttered his prophecy, more than a decade before, as to the city which was springing up there. Two presidents of the company had reported to the stockholders its critical situation on account of the Warner judgment, and sale under it, and the demands of its creditors. A special meeting had been called to deal with this situation of which notice had been given the stockholders by mail, as well as by publication in the newspapers. Some of the stockholders received these notices. Complainants lived in the same city in which the Tennessee Company, the majority stockholder, had an office, and in whose office meetings of the directory of the Land Company were frequently held. Communication by rail between New York and Ensley was easy. An inquiry could have been sent at any time from the home of complainants, in New York, to Birmingham, and an answer returned by mail within four or five days. The law charged complainants with knowing who their directors were, and complainants therefore knew that McCormack was a director, and the length of his service. The court does not doubt that complainants, long before the filing of their bill in 1902, actually knew that the Land Company had lost and regained possession of its property, that the trustees had been in possession for over a year, selling portions of the property, before it was restored to the Land Company, and that the Ensley Company, McCormack, and Ramsey had gone into possession in 1898, and that shortly thereafter the town began to be rapidly built there.

The excuse the complainants tender for the delay in filing their bill is that they were ignorant of the secret knowledge defendants had as to the steel plant, and also of their secret interest in the purchase, or that McCormack organized, or had an interest in, the Ensley Company when it bought the property from Mrs. Warner, and when it sold to Barker and Bowron. The proof shows that there was no plot, and there was no interest of the directors or trustees in the purchase by the Ensley Company from the trustees, other than that of McCormack, whose interest was open and avowed. There was no determination of the Tennessee Company to build a steel plant at Ensley, at the time of the transactions complained of. The only thing not known to, or concealed from, the complainants, according to the proof, was Mc-Cormack's connection with or interest in the Ensley Company at the time it was formed, and when it bought from Mrs. Warner, and when it sold to Barker and Bowron, and why he formed that company.

Complainant's knew that McCormack was a director up to the 25th of January, 1898, and consequently occupied fiduciary relations to the Land Company, at the dates when the Ensley Company was formed, when it purchased from Mrs. Warner, and when it sold to Barker and Bowron. These conveyances were all of record, and there was also on record a declaration of trust by Barker and Bowron, and also, later, a conveyance from them as trustees to the Land Company. These conveyances and the possessions under them showed how the trust was created, and how the Land Company regained title to its property and held possession for nearly three years before this bill was filed.

The steel plant had been erected in 1898. The denials of the bill itself do not disclaim knowledge on the part of the complainants of the open facts of the transaction shortly after they transpired. They knew long before the bill was filed that the Ensley Company, McCormack, and Ramsey were on the lands, improving them, and that they claimed the right to do so under the conveyances from the trustees. The incorporation proceedings of the Ensley Company showed that it was formed to buy this very land, and that none of the defendants appeared as its officers or stockholders of record. The complainants knew then, or were conclusively charged with notice, that the Ensley Company was formed in December, bought the property in December, and sold it to Barker and Bowron as individuals in December, of the same year, 1897, and that, within less than two months thereafter, this same Ensley Company, which had sold the property to Barker and Bowron, as individuals, purchased from them as trustees, paying a greater amount of cash for 230 acres which were carved out of it than it exacted two months before for the entire tract of land, and that the Ensley Company and McCormack, who was a director in December, 1897, and January, 1898, was openly interested in these purchases from the trustees, and in possession of the lands, improving them. The facts and circumstances pertinently suggested the inquiry why the Ensley Company sold the entire tract of land to Barker and Bowron, as individuals, and then repurchased from them as trustees, shortly thereafter, a small part of the same tract, paying therefor, more than the amount for which the Ensley Company sold the entire tract to Barker and Bowron. They pointedly suggested the further inquiry, whether McCormack, who openly avowed an interest in the Ensley Company at the time of its purchase from the trustees, only two months after that company was formed, and after it purchased the property from Mrs. Warner, and sold it to Barker and Bowron before they became trustees, did not have some connection with that company and with Barker and Bowron in the beginning of the trusteeship. An inspection of the record of the incorporation proceedings of the Ensley Company would have shown that whatever interest McCormack or Ramsey had in that company was then kept off the record. The inquiry, so plainly suggested, pursued with any sort of diligence, would have led up to the discovery long before the bill was filed that McCormack promoted the Ensley Company, and its purchase from Mrs. Warner, and its sale to Barker and Bowron, and that he was interested in the Ensley Company at the time, and would also have developed his motive for not appearing of record in its dealings with the property of the Land Company at that time.

If complainants have failed to pay "any attention to the affairs of the Land Company," as one of them frankly testifies, saying that he never attended stockholders' meetings, though he had notice of them, but generally sent proxies whenever asked, their indifference amounted to gross negligence and inattention to their own interest, and cannot excuse them when they become actors and seek to assert those interests in a court of equity. Complainants knew, or were conclusively charged with notice, under the evidence, that McCormack, Ramsey,

and the Ensley Company were all the while going ahead, in reliance upon their conveyances and their contracts with the trustees, expending time, energy, and money, endeavoring to perform their engagement with the trustees, to build up the town, improving the property they purchased for themselves, and involving themselves in onerous engagements, and that the property was rapidly increasing in value. It was highly inequitable, under such conditions, for complainants to remain idle and silent for four years. They had no right, in equity and good conscience, to speculate upon the defendants during this long period, while they were making up their minds whether they would claim the benefit of the venture, if it proved successful, and leave the loss to fall upon the defendants, if it turned out disastrously. Their long delay, under the circumstances, estops them from complaining of the sales in a court of equity. Ashurst's Appeal, 60 Pa. 290; Twinlick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Kent v. Quicksilver Mining Co., 78 N. Y. 159; Sheffield Land Co. v. Neill, 87 Ala. 159, 6 South. 1; Foster v. R. R. Co., 146 U. S. 99, 13 Sup. Ct. 28, 36 L. Ed. 899; Johnston v. Standard Mining Company, 148 U. S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480; New York City v. Pine, 185 U. S. 99, 22 Sup. Ct. 592, 46 L. Ed. 820.

Let the bill be dismissed.