## PNEUMATIC GAS COMPANY v. BERRY & Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF MICHIGAN.

Argued January 7, 1885.—Decided February 2, 1885.

A release by a corporation to one of its directors of all claims, equitable or
otherwise, arising out of transactions under a contract between the corpo-
ration and the director made in excess of its corporate powers, is valid, if
made in good faith, and without fraud or concealment.

The facts which make the case are stated in the opinion of
the court.

*Mr. Walter H. Smith* and *Mr. C. W. Holcomb* for appellant.

*Mr. Ervin Palmer* for appellees.

Mr. JUSTICE FIELD delivered the opinion of the court.

This case comes before us on appeal from the decree of the
Circuit Court for the Eastern District of Michigan. The facts,
so far as necessary to present the point of our decision, are as
follows:

In 1869, and previous to March of that year, several persons
interested in a patent for the manufacture of illuminating gas,
and gas machines known as "Rand's Patent," for the States of
Michigan, Wisconsin, Illinois and Iowa, agreed to unite their
interests, obtain an act of incorporation from the legislature of
Illinois and do business in Chicago. They accordingly applied
to the legislature of the State, and, on the 24th of March fol-
lowing, obtained an act duly incorporating them and their as-
sociates and successors under the name of the Illinois Pneu-
matic Gas Company. By its third section the corporation was
invested with power to manufacture and sell illuminating gas,
to be made from petroleum or its products under the patents
owned or to be owned by the company, or in which it may
have any title or interest, issued or to be issued to A. C. Rand;
also to manufacture and sell the works and machinery with all

needed materials and appliances for such manufacture, and to make assignments and grant licenses under the patents in the same manner and to the same effect as if the corporation were a natural person.

In September, 1869, the corporators organized under the act of the legislature, adopted a set of by-laws for the management of the affairs of the company, and, pursuant to them, elected a board of nine directors, with full control of its property and franchises, and a president, secretary and treasurer and general manager. The defendant, Joseph H. Berry, was chosen as one of the directors, and Mahlon S. Frost was chosen treasurer and general manager. From this time until the 1st of June in the following year, 1870, the company carried on at Chicago the business of manufacturing gas machines. But the business was not profitable, and the company ran in debt and became embarrassed. Judgments were recovered against it, upon which executions were issued and levied upon its property. It was without money, or credit, or any available means of raising funds, and the forcible sale of its whole property was imminent. Under these circumstances, the general manager, Frost, consulted the defendants as to the course which should be pursued, and, as the result of the conference, the defendants entered into an agreement with him to the effect that, if he would take the property of the company and continue its business under his personal supervision and management, they would advance sufficient money to pay its outstanding debts and to carry on the business already obtained and to develop and increase it. Having this agreement with the defendants, Frost made a proposition to the board of directors of the company to take its property and franchises for two years from June 1, 1870, continue its business for that period at his own expense, pay its existing liabilities, and at the end of two years return to the company the property received, and transfer to it the right to manufacture gas with a machine known as the "Maxim Gas Machine," and the right to sell the same in Illinois. This proposition was accepted by the directors and embodied in a written agreement, executed by the company through its president and secretary, bearing date on that day. This agreement is, in fact, a lease by the

company to Frost, for the period of two years, of the good-will of its business, of its right to manufacture gas and gas machines, of its franchises, machinery, implements, tools and fixtures, and a sale of its gas fixtures then on hand, and machines then in process of being made, and its stock and materials, notes, book accounts, claims and demands. And the agreement provided that, in consideration of the lease and sale of the property, Frost should pay all the then liabilities of the company as the same matured, excepting the amount then due to him (which was to continue a liability as though the agreement had not been made), procure the right to vend the patented "Maxim Gas Machine" for the State of Illinois, and at the end of the lease return to the company all the property received from it and the business which he had built up or acquired. Frost was then a director of the company, and, upon the execution of the agreement, he took possession of its property and assets, and conducted the business until August 1, 1870, when he transferred to the defendants all his interests and privileges. They thereupon took possession of the property, commenced the manufacture of gas machines at Chicago, and continued in the business until their machinery was destroyed by fire in October, 1871. During this period they paid the debts of the company, and carried out the conditions of the lease and sale, except as to the purchase of the "Maxim" patent. After the fire the directors extended the lease for two years, and consented to the removal of the manufacturing works to Detroit. The defendants accordingly removed the works to that city, where they afterwards carried on the business.

The lease, as extended, did not expire until June 1, 1874, but in April, before its expiration, the defendants offered to surrender it and the business to the company on certain conditions. The offer was accepted, but the proposed agreement fell through from a failure of the company to comply with the conditions.

Again, after the termination of the lease, and on October 15, 1874, the defendants made another proposition to the board of directors, which was, in substance, to sell to the company their stock on hand, including machines finished wholly or in

part, at a valuation to be estimated by a committee to be appointed by the company, less the value of the property to be turned over to the company under the terms of the lease and their proportion of the working capital necessary to purchase the tools and machinery. In consideration of this agreement the defendants were to be released from all claims of the company, and were to carry on the business at Detroit for one year without compensation, the company to have the profits made. This proposition was accepted, and, pursuant to it, certain of the stockholders gave their notes to the defendants in purchase of the property then on hand, which were afterwards paid. This arrangement, however, fell through, as some of the stockholders failed to furnish their proportion of the purchase money for the property.

On the 15th of March, 1876, the defendants made a third proposition to the directors for the adjustment of their business, which was accepted and incorporated into an agreement executed on that day. It transferred to the company the interest in the lease to Frost remaining in them, and stipulated to assign and transfer on demand all of the capital stock owned by them for the sum of $274 and the right to manufacture gas machines at some one place to be selected by them in certain named States, with the privilege of selling the machines. It stipulated to pay and deliver to the stockholders the moneys received from them under the contract of October 15, 1874, with interest thereon, and to deliver up such notes as they then held. And on the other hand, the company stipulated to pay to the defendants their proportion of any royalty that might be collected on the patents during the time the defendants owned stock in the company in the proportion that their stock bore to the whole stock of the company, and it released them from all claims, either equitable or otherwise, which it had by virtue of previous agreements or transactions.

The provisions of this agreement were fully carried out by the defendants. They paid over to the several stockholders the money and surrendered the notes they had received under the agreement of October 15, 1874, and interest on the money. Notwithstanding this settlement, and the release of the com-

pany thereby executed, the present bill was filed by it in September, 1877, upon instructions of its board of directors, to cancel the lease and contracts, to charge the defendants as trustees, and compel them to account for the property received from the company and profits made by them in their business under the lease. It set forth the lease and the transactions we have mentioned, and charges that they were made in excess of the authority of the directors, and were therefore null and void; that it was a breach of duty on their part to make the lease to Frost, and, on his part, to receive it, he being the treasurer and general manager of the company; and, also, that the release was invalid because the defendants then had in their possession unaccounted for, the sum of at least $60,000 derived from their business under the lease, which belonged to the company.

The answer of the defendants explained the agreements and transactions with the company, its insolvent condition when the lease was made, the repeated offers to return the property and turn over the business to the company, and the final settlement and execution of the release of the company by the agreement of March 15, 1876. The lease to Frost and the contracts and transactions between the parties were fully disclosed by the proofs produced, and the court held, after full consideration, that under the embarrassed circumstances in which the company was placed at the time, judgments being rendered against it and executions levied upon its property, which was about to be sold, the lease was a valid transaction. Had it not been made, said the court, and the money furnished by the defendants to meet the liabilities of the company, its whole property would have been sacrificed and its business entirely broken up; and though Frost, to whom the lease was made, was at the time a director of the corporation, that fact of itself was not sufficient ground to set aside the contract, it being made to protect the interests of the company and without any fraudulent design on his part.

The court also held that it ought not to set aside the lease for other reasons, namely, that it had been executed over seven years before any objection was made to it, and had during this

time been repeatedly ratified; and, that the release executed under the agreement of March 15, 1876, was a full and final settlement of the matters and claims between the parties, there being no evidence that the settlement was obtained by fraud or any improper conduct of either party. The court therefore dismissed the bill, and from its decree the cause is brought by appeal to this court.

A court of equity does not listen with much satisfaction to the complaints of a company that transactions were illegal which had its approval, which were essential to its protection, and the benefits of which it has fully received. Complaints that its own directors exceeded their authority come with ill grace when the acts complained of alone preserved its existence.

But it is not necessary to rest our judgment of affirmance of the decree of the court below upon any consideration of the character of those transactions. After seven years' acquiescence in the lease, something more must be shown than that it was executed in excess of the powers of the directors, before the lessee will be required to surrender the profits he has made under it. The lease expired June 1, 1874; the disposition of the property was settled by the agreement of March 15, 1876; and the release is an answer to all claims for the profits made by the defendants. The release is of itself sufficient to justify the dismissal of the bill. There is no evidence that it was obtained upon any fraudulent representations. Nothing was kept from the parties when it was executed. Indeed, all the transactions between the defendants and the company, from the time they took from Frost an assignment of the lease, were open and well known. There was no concealment, either had or attempted, of anything that was done, and no just reason can be given for disturbing the settlement made.

*Decree affirmed.*