JEFFREY v. PIONEER PLACER DREDG-ING CO. et al.

No. 1540.

District Court, D. Montana, Helena Division.

April 16, 1943.

J. A. Poore, of Butte, Mont., Lawrence D. Stanley, of Columbus, Ohio, and Suel O. Arnold, of Milwaukee, Wis., for plaintiff.

P. E. Geagan, of Butte, Mont., for Pioneer Placer Dredging Co., Yuba Associated Engineers, and Newton Cleaveland.

Wm. Meyer, of Butte, Mont., and S. P. Wilson, of Deer Lodge, Mont., for Gold Creek Mining Company.

Toomey, McFarland & Chapman, of Helena, Mont. (later withdrawn), for William M. Schmit.

Charles M. Blackmar, of Kansas City, Mo., for Pioneer Placer Dredging Co.

PRAY, District Judge.

This is a suit cognizable as a case in equity, commenced by the above named plaintiff, Florence Rodgers Jeffrey, as a stockholder of Gold Creek Mining Company, against Pioneer Placer Dredging Company, hereinafter called Pioneer, Gold Creek Mining Company, known as Gold Creek, Yuba Associated Engineers, Ltd., known as Yuba. Newton Cleaveland and William M. Schmit, all named as defendants herein.

From the complaint it appears that the principal purposes sought to be accomplished are the cancellation of the mining lease from Gold Creek to Yuba, and to require the defendants to account to Gold Creek for all profits derived from mining the lands of Gold Creek. The mining lease in question was assigned by Yuba to Pioneer.

The ground alleged for cancellation of the lease is that it was fraudulently induced and procured and was executed in fraud of the rights and interests of Gold Creek and its stockholders, which includes the plaintiff herein. The reason for bringing the suit as alleged by plaintiff is that at the annual meeting of stockholders held at Deer Lodge, Montana, July 7, 1937, plaintiff submitted in writing to said meeting a statement of facts substantially as set forth in her complaint and at the same time sought the passage of a resolution directing Gold Creek through its Board of Directors and officers to commence a suit, in any court having jurisdiction, against Pioneer, Yuba, Cleaveland and Schmit, or any of them, for the cancellation and rescission of said lease; for an accounting and restitution to Gold Creek of all profits made or received, directly or indirectly, through the mining of Gold Creek lands under said lease, and for such other and further relief as Gold Creek and its stockholders may be entitled to receive. The above resolution was lost by a vote of 135,011 shares against, to 92,647 shares for, said resolution.

It is also alleged that defendant Schmit is one of the largest stockholders in Gold

Creek, controlled it and influenced the stockholders comprising the majority faction to vote against the passage of said resolution. That the reason no demand was made upon the Board of Directors to bring this suit is that a majority of the directors were present at the said stockholders' meeting and refused to vote for said resolution. That Gold Creek, on March 2, 1933, was the owner of about 3409 acres of patented placer mining lands situated in Powell County, Montana, and also owned an equity in an unassembled gold mining dredge, tools and equipment, and other personal property on said lands or right-of-way; that on said date said property was of a value in excess of one million dollars, and at the present time is of value of over five hundred thousand dollars.

That Schmit was wholly familiar with the affairs of Gold Creek, had promoted its incorporation in 1929, and thereafter until January, 1933, was a member of the Board of Directors and an officer thereof; that thereafter he became and continued to be the confidential agent of Gold Creek. That for some time prior to the date last above, Gold Creek had met with financial difficulties and had been unable to complete the development of its mining project and to carry on mining operations. That defendant Schmit was well acquainted with the financial condition of Gold Creek, but that the officers and directors thereof were inexperienced in financing and conducting such mining operations and relied upon defendant Schmit for direction and advice. That said Schmit was the confidential agent of Gold Creek in securing the said mining lease and received compensation therefor, and while so employed by Gold Creek entered into fraudulent collusion with defendant Yuba and with defendant Cleaveland as the President of Yuba by means of a certain secret agreement by the terms of which said Schmit was to procure the execution and delivery by Gold Creek to Yuba of said lease, which would thereafter be assigned to an operating company, the defendant Pioneer, incorporated under the laws of Nevada; that Pioneer's authorized capital stock should consist of one thousand shares of cumulative preferred non-voting stock and fifteen hundred shares of common without par value, and that Yuba was to purchase one half and defendant Schmit the other half of said stock, the proceeds to provide working capital. Yuba was to furnish technical advice and other services for a fee to be fixed by Yuba and Pioneer. That prior to and pending negotiations for said secret agreement and lease, and at the time they were executed, the defendants Cleaveland and Yuba knew that Schmit was a confidential agent of Gold Creek. That Yuba had no assets and it was not intended that it should operate under the lease but be used as the vehicle for the assignment through Pioneer to them of said property and the earnings therefrom, in furtherance of their fraudulent plans.

Having secured the secret agreement, Schmit thereafter obtained the consent of the Board of Directors of Gold Creek to lease its lands and personal property to Yuba. The said lease, caused to be prepared by Schmit, Yuba and Cleaveland, was for a term of ten years, and Yuba agreed to pay Gold Creek as rental a royalty of fifty per cent on all recoveries of gold and other precious metals recovered by Yuba, its successors or assigns, in excess of eleven cents per cubic yard of material dredged, the lessee to retain the whole of the proceeds up to eleven cents per cubic yard and the remaining fifty per cent of the excess over eleven cents per cubic yard. That in order to procure the execution of the lease defendant Schmit falsely represented to the Board of Directors of Gold Creek, and its officers, that the lease was advantageous to Gold Creek and the terms were the best that could be obtained, although the eleven cent charge was excessive and unprofitable to Gold Creek as the maximum dredging cost to Pioneer had not exceeded six cents per cubic yard for materials dredged. That said lease would not have been executed had the Board of Directors, officers or stockholders known of the fraudulent secret agreement between Yuba, Cleaveland, Pioneer and Schmit. That later on Schmit failed to carry out his agreement to purchase one half of the stock of Pioneer, and Yuba and Cleveland being unable to finance Pioneer, entered into a joint adventure and agreement with Lucky Tiger Combination Mining Co., a corporation (known as Lucky Tiger) whereby money was advanced by the latter to carry on mining operations on Gold Creek lands under said lease; Pioneer was to execute its notes for all moneys so advanced, and its stock was to be divided 60% to Lucky Tiger and 40% to Yuba. Under this agreement Lucky Tiger advanced $127,500 which was later repaid. That Pioneer continued

to operate the said leased lands at large profits to itself, Yuba and Cleaveland, and also to Schmit under a certain second secret agreement between Pioneer and Schmit.

On failure of defendant Schmit to purchase one half of the stock of Pioneer, a substitute method was provided so that defendant Schmit could participate in the profits of Pioneer under said lease. That the second secret agreement between Schmit and Pioneer was also unknown to Gold Creek, its officers, directors and stockholders, and provided that Pioneer should pay Schmit out of its mining profits earned under said lease the sum of one half cent per cubic yard on all materials dredged yielding ten and one half cents per cubic yard to fifteen cents per cubic yard, and the sum of one cent per cubic yard in excess of fifteen cents per cubic yard, and that under this agreement Schmit was paid by Pioneer a sum in excess of $30,000, and that Pioneer will continue to pay further additional sums unless said lease is cancelled and rescinded. That defendant Gold Creek raised large sums of money through sales of its shares of stock to the public, and invested several hundred thousand dollars in the purchase of its lands and personal property, and that although Pioneer has had invested in mining said lands not over $130,000, it has made net profits therefrom of not less than $500,000, and will continue to make large profits therefrom to the great and irreparable loss of Gold Creek and its stockholders, unless the relief sought is granted; that Gold Creek would have received practically no royalties under the terms of said lease, if the price of gold existing at the time said lease was entered into had remained constant; that the royalties it did receive was due to the fact that the price of gold was increased by the United States Government subsequent to the execution and delivery of said lease.

The defendants have all filed separate answers in which they deny any fraudulent or collusive conduct in any of the transactions set forth in the complaint, in fact, deny or explain the questionable acts charged against them in the complaint upon which the plaintiff relies for recovery. The defendant Schmit denies that he was the confidential agent of Gold Creek or that he entered into any secret or fraudulent agreement with the other defendants, or any of them, and the other defendants deny any knowledge of his confidential agency for Gold Creek or that there was any collusion or conspiracy among them, or on the part of any one of them, fraudulently to procure the execution of said lease, or the sale thereafter of the Gold Creek property to Pioneer. And so the issues raised in the complaint appear to have been met and fairly covered by the defendants in their several answers.

Defendants assert there are certain defenses to the suit not common to all defendants, and that transactions occurring between Gold Creek and Yuba Manufacturing Company, the vendor of the dredge in question, prior to the arrival of Schmit in San Francisco in February, 1933, to negotiate a lease of Gold Creek property, are of little importance so far as the issues in this case are concerned, and the court might add, except to illustrate the nature and extent of the acquaintance of Cleaveland and Schmit, and perhaps show what information Mr. Cleaveland had acquired concerning the affairs of Gold Creek and Mr. Schmit's connection therewith, and what justification the former may have had for any confidence he may have reposed in the representations of Schmit to the effect that his official connection with Gold Creek was at an end and that he represented himself only in the present undertaking. If the terms of the lease were acceptable to Gold Creek the first plan discussed seems to have been for the organization of an operating company with each taking half the stock and contributing his share of the funds, but this arrangement was not carried out and Schmit was later promised a certain royalty to be agreed upon, if he were willing to forego the first plan of acquiring an interest in the operating company.

Schmit's version is that certain directors of Gold Creek, whom he named, had agreed to contribute various sums which added to his own contribution would equal the one half interest in the operating company, but that later they all declined to go into the new company. Schmit said that he raised the money elsewhere and told Cleaveland that he was ready to fulfill his part of the agreement, but the latter advised him that he had decided to proceed under the alternative understanding; that he (Cleaveland) had made other arrangements for the organization of an operating company and to obtain the money necessary for development of the Gold Creek property. Schmit

said, in substance, that Cleaveland's decision not to adopt the first plan discussed was the reason for the latter allowing a royalty to repay him for his labor and expense. He received the royalty in separate amounts at different times beginning with the year 1934, and the exact amounts were established by Mr. Arnold, counsel for plaintiff, in taking the deposition of Schmit in Milwaukee, by producing certified copies of the royalty figures obtained from the "Board of Equalization." How and when these figures were obtained does not appear or why they were not produced earlier for use in other suits involving charges against Schmit, or the other defendants herein, or for use in a suit by plaintiff which might have been commenced at an earlier date.

Consideration should be given to the consultation with Judge Zook, and especially to the conversation had with him in February, 1933, concerning the lease, by Mr. Schmit, wherein the latter in response to questions by the former, and in the presence of Mr. Cleaveland, expressly declared that his sole interest in Gold Creek was only that of a stockholder and that he represented himself only in negotiating the lease. Since lack of knowledge of Schmit's connection with Gold Creek as its representative in this transaction is a defense of Yuba and Pioneer the absence of Judge Zook at the trial, either in person or by deposition, exposes the defense to the usual criticism of failure to call a material witness to the party's cause of action or defense.

As to averments of defendants in respect to fairness of the terms of the lease in asserting that cost of dredging operations rather closely approximated eleven cents per cubic yard, the table quoted by plaintiff, which appears to be reliable, shows that for 1934, 1935 and 1936 the cost of dredging operations per cubic yard was 5 and 1/3 cents for 1,704,312 cubic yards; 6 and 3/5 cents for 1,987,410 cubic yards and 7 and 1/2 cents for 1,577,507 cubic yards. Mr. Cleaveland referred to the experience of the Conry Mining Company, for many years dredge mining in Alder Gulch, Montana, as a fair basis for estimating costs. After the conference above noted, Mr. Schmit took the prepared lease to Gold Creek and it was approved by the Board of Directors after several weeks consideration. The defendants contend that the lease was in the usual form,

had to do with mining prospects the value of which was unknown, and in the light of their experience and information was fair to all parties, and that it had been examined in Montana before its execution by Gold Creek in Milwaukee, by Mr. Jillson, Secretary of Gold Creek, by Mr. Sauber, a director, by Mr. S. P. Wilson, its attorney, and by Mr. Charles R. Leonard, an attorney and stockholder, and who at one time held the proxy of the plaintiff herein and voted to affirm the lease. Before the lease was formally approved by Gold Creek in Milwaukee attempts were made by Schmit and other persons to interest other capital in Gold Creek on a more favorable basis but without success. The plaintiff doubts the sincerity of such efforts.

There is much to show internecine strife in the affairs of Gold Creek, and a frequent scramble for proxies for use at stockholders' meetings. Mr. Stanley, one of counsel for plaintiff, was able at one time to gain control and become president of Gold Creek; he represented chiefly the interests of the plaintiff herein, and had heard reports that Schmit was being paid a commission or royalty for negotiating the lease. July 31, 1934, the McCloud suit, so referred to, was brought charging Schmit, Yuba, Pioneer and others with fraud in connection with securing the lease; the petition in that case purported to be for the benefit of all stockholders of Gold Creek, and two of them intervened, but the plaintiff took no part in that suit, which as it appears was never brought to trial.

In view of the different suits commenced involving Schmit's alleged fraud, validity of lease, damages claimed for violating its terms, ineffectual efforts and delays on the part of plaintiff and her representatives and others interested in Gold Creek, it would seem that a serious question is presented as to the right of plaintiff to maintain this suit, especially against Yuba, Cleaveland and Pioneer. There should, of course, be taken into account all the surrounding circumstances, the reports coming to Mr. Stanley's attention, which he describes as rumors, and to Mr. Arnold, the Milwaukee counsel for plaintiff, about the time Mr. Stanley became president of Gold Creek and later, and their failure and the failure of others interested, to investigate the charge against Schmit—even to the extent of making inquiry either of Lucky Tiger or Yuba or Pioneer as to whether any consid-

eration, in any form, was being paid or promised by them, or any of them, to Schmit, arising out of the leasing of Gold Creek lands; but apparently they all waited, as the years passed, until some one interested in Gold Creek happened to learn through Lucky Tiger that Schmit was being paid a royalty in the Gold Creek property. In this connection the conversation between Messrs. Cleaveland and Stanley and Messrs. Stanley and Blackmar concerning any interest of Schmit in Pioneer has been taken into account. Irrespective of the conduct of Schmit, which doubtless could have been ascertained as a fact long before the plaintiff's alleged date of discovery, can it now be said, after permitting large expenditures by the lessee, accepting the benefits of the lease, twice ratifying it—once by her proxy, Mr. Leonard, and after admittedly acquiring full knowledge of the Schmit royalty, that plaintiff could then allow the matter to remain in suspense for a period of fourteen months before bringing suit for the cancellation of the lease; in fact, effect a delay of two years, or more, longer than necessary, if any reasonable effort had been made or diligence exercised to ascertain the facts.

It seems to the court that a simple straightforward question propounded by an officer or director of Gold Creek to Lucky Tiger, Yuba or Pioneer would have elicited the information sought. At any rate, they could have been summoned into court and put under oath in some of the suits referred to, or examined under the well known rule for depositions and discovery, and there can be little doubt as to the result. The fact of payment of a commission or royalty to Schmit was available in the net proceeds return early in 1935 with the State Tax Commission, and could have been found in the tax assessed against property of Schmit in Powell County, Montana; in both instances the Schmit royalty was disclosed. The more persistent the reports of wrong doing on the part of Schmit the more prompt should have been the inquiry—especially where mining property was involved and the way seemed clear to obtain the desired information. Johnston v. Standard Min. Co., 148 U.S. 360, 370, 13 S.Ct. 585, 37 L.Ed. 480. Even after receiving information directly from Lucky Tiger, verifying reports concerning Schmit, many months elapsed before suit was begun, and in the meantime Pioneer was working the property under the lease, had invested large sums of money and was paying substantial royalties to Gold Creek, and the latter had theretofore borrowed a considerable sum of money from Pioneer when Mr. Stanley was President of Gold Creek. Plaintiff's excuse for the delay in bringing suit is that she wanted to submit the facts to the Board of Directors or stockholders and persuade them to bring suit in the name of the company, but, as defendants point out, there had been an earlier annual stockholder's meeting and several prior meetings of the Board of Directors to whom application could have been made. No application was ever made to the Board of Directors for the reason plaintiff believed such application would be denied.

Up to the time of sale of Gold Creek properties the Pioneer dredging operations had resulted in the following payments: Gold Creek, $149,551.65; Wm. Schmit, $32,019.52; Lucky Tiger, $47,276.42; Yuba, $31,517.62. In addition Yuba received $500 per month for management of mining operations under a contract for two years. Since then because of difficulties encountered Pioneer has incurred a debt to Lucky Tiger of $145,745, according to Pioneer, and it seems to be correct. Gold Creek has received in royalties $149,551.65 plus $87,500, sale price of the properties, in all $237,051.65. Whether this sum represents a fair return would be for an impartial business expert to determine from all the facts; the vote of stockholders and directors from time to time would indicate that they approved. The fact appears from the evidence that before Yuba had raised a sufficient sum of money through Lucky Tiger to develop the properties, Gold Creek had been in dire financial straits, and on the verge of bankruptcy. In this connection the inquiry might be made, whether Yuba or Cleaveland, if either were desirous of taking advantage of the financial distress of Gold Creek, would have been likely to have submitted alternative plans and extensions of payments for the mining dredge, later entering into a lease and allowing themselves to be held up for a royalty by Schmit, rather than take advantage of the opportunity that seemed imminent through operation of the bankruptcy law. Unfortunately this is not a rare expedient resorted to by persons not too sensitive to higher ethical considerations.

On January 23, 1935, at a stockholders' meeting of Gold Creek the said mining lease was again ratified, approved and con-

firmed, this time by a vote of 213,092 shares, in favor of the resolution, to 150 against. This action was taken for the reason set forth in the resolution: " * * * and, whereas, a stockholder of this company and others not interested in this company have attacked the legality of said indenture, above referred to, and litigation has been instituted involving the legality thereof * * *." Undoubtedly the McCloud suit was there referred to, which contained substantially similar charges against defendant Schmit as are found in the complaint in the instant suit. The votes by proxy of the plaintiff herein and Mr. Stanley were cast in favor of that resolution. As to the personnel of the defendants in the McCloud suit it is pointed out by counsel: "that Edward G. Mockley, and K. G. Mockley, his wife, A. C. Reediger, A. H. Bitter and John Gebhardt, all active contributing members of the minority faction, were defendants in that suit and aligned as co-conspirators of William M. Schmit." All of them were, or had been, officers or directors of Gold Creek. This appears to be the same group who were sponsors for the Breede suit against Schmit in Milwaukee, and who secured the services of Mr. Arnold, who is also attorney for Mrs. Jeffrey in this suit. As the court recalls the proof, none of these interested persons ever made any serious investigations in connection with either suit. At the stockholders' meeting January 23, 1935, they all voted to ratify and confirm the lease.

Some of these witnesses who were or had been directors have testified that they did not have full knowledge of the Schmit negotiations with Yuba until 1936, and yet they were defendants in the McCloud suit commenced July 30, 1934. The petition in that suit contained the following charges against Schmit: "That as plaintiff is informed and believes and states the fact to be, William M. Schmit, the President of Gold Creek Mining Company from the first day of January, 1932, until January 31st, 1933, was at all times in the hire and pay of defendant, Yuba Associated Engineers. Ltd., for the purpose of promoting and procuring defendant, Gold Creek Mining Company, to enter into the lease and agreement hereinafter set forth, and he was bribed by said Yuba Associated Engineers, Ltd., for the promise of receiving and being paid one-half of one per cent of the gross value of the gold that might be extracted from the properties of Gold Creek Mining Company under and by virtue of said lease. That the lease hereinafter described was drawn by counsel hired personally by the said William M. Schmit." He was further charged in said petition with being paid "in fulfillment of said bribe and promise the sum of $2,400.00 per month."

Plaintiff's brief refers to the amount Schmit was to receive as $200. per month. In the light of the facts as they now appear both sums were incorrect, although the amount stated in the McCloud suit was not far off. As an excuse for voting in favor of the stockholders' resolution of January 23, 1935, confirming the lease, plaintiff's counsel states: "Having mislead all shareholders by their answers made under oath, it is strange, indeed, that they have the effrontery to claim that the McCloud suit gave notice to the shareholders of a secret agreement with Schmit." Unfortunately for this argument, the record in the McCloud suit shows that on the date of the above stockholders' meeting when the lease was confirmed no answers had been filed in the McCloud suit by either Cleaveland, Yuba or Pioneer, nor were any filed until December 10, 1935.

It would seem fair to assume that in voting a second time for confirmation of the lease that such act represented the deliberate best business judgment of the stockholders at said meeting, and that, notwithstanding, the current reports and charges in the courts involving a breach of trust on the part of Schmit, the stockholders were determined that the mining lease should stand as drawn and as theretofore approved. There is no charge of fraud in connection with this vote, and it does not appear that Schmit or any other stockholder dominated this meeting.

Mr. Cleaveland stated to Mr. Stanley in reply to the latter's inquiry, that Mr. Schmit had no interest in Pioneer. In the conversation on the train to Chicago between Mr. Stanley and Mr. Blackmar, attorney for Pioneer, this answer was discussed, and, as it seems to the court, both learned counsel were not far apart in their understanding, and that Mr. Cleaveland gave the correct answer as the question was propounded to him, which is further evidenced by the fact that Lucky Tiger owned 60% and Yuba 40% of the stock of Pioneer. The evidence shows that Schmit was the agent of Gold Creek and was paid by it;

he represented to Cleaveland that he was not the agent of Gold Creek and was acting solely in his own interest, and profited thereby. Why former suits were not prosecuted to a successful conclusion does not clearly appear. If the excuse is inability to procure evidence, that would not be acceptable in view of the circumstances disclosed in this suit.

■ It is evident from the facts that experienced mine operators like Lucky Tiger and Yuba considered the venture highly speculative and were unwilling to make large expenditures until the Gold Creek property had been thoroughly prospected and the former advanced $5,000 for that purpose, and the result being satisfactory, large sums were thereafter expended in its development. After Gold Creek had accepted the returns from these mining operations, four years after the execution of the lease, a stockholder commenced this suit for its cancellation. As an illustration of the principle involved one authority cited holds: "It is an elementary principle of equity that a person claiming an interest in property must be diligent in asserting his claim. "The law helps the vigilant, before those who sleep on their rights." Sec. 8756 Rev.Codes, 1921. In no other class of cases is the doctrine of laches enforced more relentlessly than in that class involving mining claims, and the reason for the rule is apparent." O'Hanlon et al. v. Ruby Gulch Mining Co., 64 Mont. 318, 328; 209 P. 1062, 1064.

In Buchler v. Black, 9 Cir., 226 F. 703, 707, the court held: "But even if the corporation had ground for impeaching the title acquired * * * at the receiver's sale on account of his fiduciary relation to the company—and the appellant is in no stronger position to attack it than would have been the corporation—the right to the relief sought is barred by the appellant's laches." And again, in a suit where an option to avoid a sale had to be exercised within a reasonable time, after the facts connected therewith were made known, or could by due diligence be ascertained, the court said it has never been held to be any determined number of days or years as applied in every case like the statute of limitations, but must be decided in each case upon all the elements of it which affect the question. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328. In another case it was stated that in some in-

stances the diligence required is measured by months rather than by years. Patterson v. Hewitt, 195 U.S. 309, 319, 25 S.Ct. 35, 37, 49 L.Ed. 214.

And in respect to the rule governing the inquiry which plaintiff was in duty bound to make concerning the reports of Schmit's infidelity, the court said in Cordova v. Hood, 17 Wall., U.S., 1, 8, 21 L.Ed. 587, in stating the equity rule: "Wherever inquiry is a duty, the party bound to make it is affected with knowledge of all which he would have discovered had he performed the duty. Means of knowledge with the duty of using them are, in equity, equivalent to knowledge itself." The first two cases, Twin-Lick and Patterson, were relied upon by Judge Gilbert in Buchler v. Black, supra. Also to the same effect, Weniger v. Success Mining Co., 8 Cir., 227 F. 548, 557.

■ Laches is said to apply where a person fails to take advantage of opportunity and occasion for asserting rights. Van Senden v. O'Brien, 61 App.D.C. 137, 58 F.2d 689, certiorari denied 287 U.S. 608, 53 S.Ct. 11, 77 L.Ed. 528. In determining whether a party is guilty of laches barring equitable relief, neglect to learn what might be known is counted as knowledge, where there is suspicion of fraud. Holman v. Gulf Refining Co., 5 Cir., 76 F.2d 94, certiorari denied 296 U.S. 590, 56 S.Ct. 102, 80 L.Ed. 417.

■ The established principles as to the discovery of fraud are that the party defrauded must be diligent in making inquiry, that means of knowledge are equivalent to knowledge, that a clue to the facts, which, if diligently followed, would lead to a discovery, is, in law equivalent to a discovery. Mere ignorance of the facts will not excuse delay, but the party must be diligent and make such inquiry and investigation as the circumstances reasonably suggest, and means of knowledge are equivalent to actual knowledge. Winn v. Shugart, 10 Cir., 112 F.2d 617.

Where the fraud by which a promoter of a corporation secured an unlawful bonus was concealed, a federal court of equity will not deem a right of action for its recovery to have accrued until the fraud is discovered, or should have been discovered. Tilden v. Barber, D.C.N.J., 1920, 268 F. 587. Another authority which seems to have rather close relation to the issues here is that of Russell v. Republic Pro-

duction Co., 5 Cir., 112 F.2d 663, 666, 667, wherein the court held that the concealment of a breach of trust on the part of a fiduciary weighs heavily against a claim of laches. In that case the agent recorded a deed to a royalty interest, which he had purchased, in the name of another person, withholding his own deed from record until the property should prove of value, which occurred. The suit against the agent was commenced within six weeks after he had recorded his own deed. The court said in that case that there was conflict as to what was known, and the president of this company testified that while he had heard rumors, he had no direct proof until the deed was recorded. While the facts in the cited cases are different from those in the present case, there is a like principle involved which the court might apply, in respect to laches under circumstances showing a more diligent and timely effort on the part of plaintiff or some one of the many persons interested in detecting a breach of trust on the part of Schmit in negotiating the lease with Yuba, and who had a suspicion, or had heard reports, or had actual knowledge, or the means of knowledge, of his conduct.

In Mr. Stanley's letter to plaintiff August 13, 1934, he refers to the charge made in court that Mr. Schmit was in the pay of Yuba and receiving a royalty or percentage of the gold recovered from the Gold Creek property. As will also appear from the evidence information concerning Schmit's transactions was possessed by another officer of Gold Creek in 1934. In the letters of November 1 and 6, 1934, by Harry J. Zieman, President of Gold Creek, to William Schmit, it is disclosed that the terms of the latter's royalty interest in Gold Creek property was known by the writer as early as October 15th, 1934, and were given as: "a commission or compensation of 1c per cubic yard on items over 14c and 1/2c per cubic yard on items between 10½ and 14c." In his first letter, that of Nov. 1st, Mr. Zieman stated: "It was only about two weeks ago that I learned of the existence of such an agreement."

■ Gold Creek brought a suit for damages against Pioneer and Yuba in October, 1935, based upon the claim that the defendants had failed to perform certain terms of the lease; this was case No. 1442 in the United States District Court at Butte, Montana; this suit, instituted with the consent of Gold Creek's officers and directors, might be construed in effect as another affirmation of the lease. Counsel particularly direct the court's attention to the almost unanimous ratification, and approval of the lease on January 23, 1935, and the original approval, and also the approval indicated by the commencement of the suit, above mentioned, for damages by Gold Creek against Pioneer under terms of the lease, rather than for cancellation of the lease. If it had not been for such indications of approval of the lease Pioneer would not have incurred the debt to Lucky Tiger of $145,000, so contends counsel for defendants; and further, that if the resolution of approval is not sufficient in itself to defeat plaintiff's claim, it is sufficient as an estoppel because third parties have acted on the resolution of approval to their detriment; and the court finds merit in this argument, taking into account plaintiff's vote of approval, knowledge and means of knowledge concerning Schmit and Gold Creek's affairs up to that time. It was not plaintiff's or her counsel's intention at first, as shown by correspondence introduced, to interfere in any way with the lease from Gold Creek to Yuba, later assigned to Pioneer, but rather to compel Schmit to account to Gold Creek. It appears that on February 16, 1937, Mr. Stanley wrote plaintiff suggesting that she intervene in the Breede suit against Schmit pending in Milwaukee, which was not done. And so time passed to August, 1937, before any action was taken by plaintiff.

■ Some of the principles in question find illustration in the following authorities: Kessler & Co. v. Ensley Co., C.C., 129 F. 397, 400; Illinois Pneumatic Gas Co. v. Berry, 113 U.S. 322, 326, 327, 5 S.Ct. 525, 28 L.Ed. 1003. There are two elements in laches, lack of diligence on part of plaintiff and injury to defendant due to plaintiff's inaction. Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co., 3 Cir., 64 F.2d 185, affirming, D. C., 57 F.2d 559. The plaintiff has had the benefit of the fruits of the contract and treated it as valid, with knowledge of the facts or with full opportunity to ascertain them. Jesup v. Illinois Cent. R. Co., C.C., 43 F. 483.

A long discussion occurs between counsel, in both main and reply briefs, attacking and defending the final sale and disposition of the Gold Creek property, which the court has considered, although such consideration might seem unnecessary in

view of the fact that the court is convinced that the doctrine of laches should have recognition and application in the decision of this case. However, in view of the fact that a long and expensive trial was undertaken, the court has considered the merits. So far as the sale is concerned, it appears to have been legally conducted, and the result of the Conroy suit against Gold Creek in Powell County, Montana, attacking the said sale of Gold Creek property, would seem to have set at rest the questions of validity of sale, deed and release put in issue in that suit. It appears that Patrick R. Conroy, who brought that suit, alleging fraud, was one of the Milwaukee group of stockholders affiliated with plaintiff in bringing this suit. The stockholders of Gold Creek approved and ratified the sale, deed and release. The petition in the Conroy suit stated: "This action is brought on behalf of and for the benefit of said corporation and on behalf of and for the benefit of said stockholders of said corporation," which might indicate that the judgment therein would be binding on the stockholders of Gold Creek. Dana v. Morgan, 2 Cir., 232 F. 85; Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356, 365, 366, 41 S.Ct. 338, 56 L.Ed. 673. N. S. Schwartz, president of Gold Creek at the time of trial, and one of the principal witnesses, stood with the group of stockholders who forced Schmit to restore certain shares of Gold Creek stock which he had procured while Mr. Mockley was president. It was a strange assortment of battling directors—at one time a certain group would be alligned with Schmit and at another the same group would be opposed to him.

Further enlightenment on the subject of Schmit's negotiations for the lease is found in the stockholder's meeting of January 24, 25 and 26, 1934, when he was interrogated by Mr. Schwartz as to whether he ever received compensation from any source other than Gold Creek as far as the lease was concerned, and he refused to answer. At the same meeting when the Chairman asked for a complete history of the transaction in negotiating the lease Mr. Schmit declined to answer any more questions without advice of counsel. Many leads appear throughout the case suggesting a breach of trust and putting interested persons directly on inquiry. He returned to the company the 55,000 shares of Gold Creek stock that had been issued to him for services in negotiating the lease,

outlay and expenses, but it was not returned without pressure. This transaction was not of a character to inspire confidence. Later he was given ten thousand shares of Gold Creek for his efforts in place of the fifty-five thousand shares returned.

While Schmit no doubt possessed certain qualities of leadership and salesmanship and took an active part in the meetings of directors and stockholders, yet it would hardly seem a fair deduction from all the evidence to say that he dominated the affairs of Gold Creek during the occurrence of the material events in question, although some of the witnesses seemed quite willing to admit the weight of his influence.

■■ Touching the merits of the controversy, after considering all of the evidence, both favorable and unfavorable, in the court's opinion it would be difficult conscientiously to hold that the charge of fraud, or conspiracy to defraud, had been sustained either by a preponderance of the evidence or by evidence that is clear and convincing against either Yuba, Cleaveland or Pioneer, or against Lucky Tiger, which, although not a party here, was a stockholder in Pioneer. However, following a line of well reasoned decisions, some of which have been cited herein, concerning fiduciary relationship, breach of trust and concealment, which has been held to weigh heavily against a claim of laches, the court is satisfied that the ends of justice require that the defense of laches should not be allowed in the instance of William Schmit, also known as William M. Schmit, and that he should be required to restore his royalty gains to Gold Creek. The evidence is clear that he was the agent of Gold Creek and had no right to accept a royalty in the Gold Creek property; that he seems to have made every effort to conceal his wrongful act, and repeatedly denied or evaded questions from directors and stockholders about his commission or royalty. Consequently a decree, as set forth in the prayer of the complaint herein, will accordingly be entered against said William Schmit for the full amount of said commission or royalty, with interest thereon, and plaintiff's costs of suit herein incurred.

In analyzing the great volume of evidence presented in this case and the lengthy briefs, and applying the law, it is conceivable that different judges, like grammarians, might differ on the same record, but fortunately for the aggrieved liti-

gant an opportunity is readily available for another hearing in which the consensus of opinion of several learned judges can be obtained.

Good cause appearing therefor, the motion to dismiss the suit as to the defendants Yuba, Pioneer and Newton Cleaveland is hereby granted; the said defendants to pay their own costs.

Brief and succinct findings of fact and conclusions of law and decrees may be submitted conformably to the rule and the views herein expressed.